**FEDERAL ELECTION COMMISSION, Plaintiff,**

v.

**POLITICAL CONTRIBUTIONS DATA, INC., Defendant.**

**No. 89 Civ. 5238 (SWK).**

United States District Court, S.D. New York.

Dec. 10, 1990.

in a pension plan." 690 F.Supp. at 376; *see also Belade v. ITT Corp.,* 909 F.2d 736, 737–38 (2d Cir.1990) (per curiam).

Lawrence M. Noble, Gen. Counsel, Federal Election Com'n by Richard B. Bader, Associate Gen. Counsel, Robert W. Bonham, III, Acting Asst. Gen. Counsel, Vivian Clair, for plaintiff.

Public Citizen Litigation Group by David C. Vladeck, Alan B. Morrison, Vladeck, Waldman, Elias & Engelhard, P.C., New York City by Anne C. Vladeck, for defendant.

## MEMORANDUM OPINION

KRAM, District Judge.

In this action for declaratory and injunctive relief, the Federal Election Commission (the "Commission" or the "FEC") seeks to enforce the provisions of the Federal Election Campaign Act of 1971 to prohibit defendant Political Contributions Data from selling compilations of contributor data reportable to the FEC under the Act. Defendant raises First Amendment, Fifth

Amendment, and other defenses. Currently before the Court are defendant's motion and plaintiff's cross-motion for summary judgment.

## BACKGROUND [1]

Plaintiff FEC is the independent agency of the United States government empowered with administering, interpreting, and enforcing the Federal Election Campaign Act (the "Act," or "FECA"). *See generally* 2 U.S.C. §§ 437c(b)(1), 437d(a) and 437g (1980). Defendant Political Contributions Data ("PCD") is a for-profit corporation, wholly owned by Political Data Access, Inc. ("PDA"), which produces campaign contribution reports to sell to the public.

FECA requires political committees to report identification information, including name, address, occupation and employer, of each person who contributes to that committee $200 or more in a year. 2 U.S.C. § 434(b)(3)(A).[2] The Act requires the Commission to make all such reports and statements filed with the Commission available for public inspection and copying, at the expense of the person requesting such copying, within 48 hours of the Commission's receipt of those documents. 2 U.S.C. § 438(a)(4). That provision, however, pro-

hibits the sale or use of information copied from such reports by any person for the purpose of soliciting contributions or for commercial purposes. *Id.*[3] A rule promulgated by the FEC excepts newspapers, magazines, books or other communications from this provision. 11 C.F.R. § 104.15(c).

In January 1986, PDA obtained from the FEC certain computer tapes containing individual contributor information compiled from the disclosure reports, pursuant to § 434(b)(3)(A). By letters dated March 21 and June 24, 1986, PDA requested a formal advisory opinion from the Commission regarding the legality of selling individual contributor information obtained from disclosure reports made available by the Commission for public inspection and copying. In its resulting Advisory Opinion, the Commission stated that the sale of compilations of individual contributor information proposed by PDA would violate FECA. Advisory Opinion 1986–25, attached as Exhibit 7 to FEC's Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment (hereinafter "Pl. Mem. I"), at 4–5.

Thereafter, PDA incorporated defendant PCD,[4] and through it provided for the ad-

---

1. The central facts are not in dispute by the parties, and are related here from the uncontested portions of the Complaint and the parties' Local Rule 3(g) statements.

2. That provision states:
   Each report under this section shall disclose—
     *   *   *   *   *   *
   (3) the identification of each—
   (A) person (other than a political committee) *who makes a contribution to the committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year, or in any lesser amount if the reporting committee should so elect, together with the date and amount of any such contribution.*
   2 U.S.C. § 434(b).

3. The provision reads in full:
   The Commission shall—
     *   *   *   *   *   *
   (4) within 48 hours after the time of the receipt by the Commission of reports and statements filed with it, make them available for public inspection, and copying, at the expense of the person requesting such copying,

except that any information copied from such reports or statements may not be sold or used by any person for the purpose of soliciting contributions or for commercial purposes, other than using the name and address of nay political committee to solicit contributions from such committee. A political committee may submit 10 pseudonyms on each report filed in order to protect against the illegal use of names and addresses of contributors, provided such committee attaches a list of such pseudonyms to the appropriate report. The Clerk, Secretary, or the Commission shall exclude these lists from the public record.
2 U.S.C. § 438(a).

4. Defendant explains that PCD was formed in response to the FEC's Advisory Opinion in an effort to insulate PDA, the parent company, from any liability that might flow from an enforcement action brought by the FEC. Deposition of Benjamin A. Goldman, President of PDA, taken January 3, 1990 (attached as Exhibit 17 to *Plaintiff's Motion to Dismiss*) (hereinafter "Goldman Deposition"), at 27–32); Deposition of Dr. Jay M. Gould, Chairman of PDA, taken January 3, 1990 (attached as Exhibit 11 to Plain-

vertisement, marketing, and sale in printed form of various compilations of the individual contributor information governed by § 438(a)(4). Defendant PCD compiled and sold two standard written reports: the Congressional District and the Corporate Affiliation contributors reports.[5] These reports contained the names of selected contributors, the amount and recipient of their contributions, along with the contributors' city, state and zip code. The reports did not contain the street address of the contributors. At the bottom of each page of the reports, the following caveat appeared:

THIS REPORT MAY NOT BE USED OR SOLD BY ANY PERSON FOR THE PURPOSE OF SOLICITING CONTRIBUTIONS OR FOR ANY COMMERCIAL PURPOSE.

Defendant PCD also compiled and sold the results of special computer "runs" of the individual contributor information, often consisting of a short list of names and contributions. These short lists were usually communicated directly over the telephone or transmitted in letters.

As of June 6, 1987, defendants sold approximately 100 reports ranging in price from $5.00 for a single report to $776.25 for a combination of reports. They billed $9,398.76 and received $4,544.73 for their products as of that date.

On August 2, 1989, the FEC brought this action for declaratory and injunctive relief plus civil penalties, alleging that PCD violated 2 U.S.C. § 438(a)(4). Defendant answered on October 2, 1989, asserting constitutional defenses. PCD has moved for summary judgment on its defenses, arguing that the FEC's construction of that provision conflicts with the First Amendment and infringes its rights of Equal Protection; it also contends that the FEC's

interpretation of the provision is incompatible with the provision itself and thus should be subject to a narrowing construction by this Court. The Commission has cross-moved for summary judgment. The Court first considers PCD's challenge to the rationality of the Agency's decision, because the Court should "not decide a constitutional question if there is some other ground upon which to dispose of the case." *Lowe v. SEC*, 472 U.S. 181, 190, 105 S.Ct. 2557, 2563, 86 L.Ed.2d 130 (1985) (citations omitted).

## DISCUSSION

### I. Standards for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir.1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).[6]

tiff's Motion to Dismiss) (hereinafter "Gould Deposition"), at 48–49.

**5.** The Congressional District Reports broke down the information by the 435 congressional districts, while the Corporate Affiliation Reports analyzed the contributions made by the officers and high-level employees of the 700 largest corporations in the United States.

**6.** The moving party may rely on the evidence in the record to point out the absence of genuine

issues of material fact. *Celotex, supra*, 477 U.S. at 323, 106 S.Ct. at 2553. The moving party does not have the burden of providing evidence to negate the non-moving party's claims. *Id.* As the Supreme Court recently noted, "whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Rule 56(e). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (interpreting the "genuineness" requirement).

## II. FEC's Interpretation of 2 U.S.C. § 438(a)(4)

Section 438(a)(4) prohibits the sale "for the purpose of soliciting contributions or for commercial purposes" of information copied from the reports mandatorily filed by political committees. The Commission determined in its Advisory Opinion 1986–25 that the PCD reports were for commercial purposes within the meaning of the statute. It also found that the reports were more like brokers' lists, which are forbidden under § 438(a)(4), than like newspaper or other traditional media publications, which are excepted, 11 C.F.R. § 104.15.

Defendant now asks the Court, *inter alia*, to review that determination. PCD admits to selling information copied from these reports, but denies that its activity constituted use for "commercial purposes." It argues that the phrase "commercial purposes" should be narrowly construed to prohibit only using the lists directly for political solicitations, which PCD is not alleged to have done.

This Court must defer to an agency's reasonable construction of its own enabling legislation, absent inconsistency with an Act of Congress. *Chevron, USA v. Natural Resources Defense Council*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–88, 81 L.Ed.2d 694 (1984) (question properly before district court is not whether in its view the regulation is inappropriate in the general context of the regulatory program in question, but whether the Administrator's view that it is appropriate in the context of the program is a reasonable one).

Consistent with *Chevron*, this Court will accord deference to the FEC's interpretation of its own enabling legislation, the FECA. The FEC is "precisely the type of agency to which deference should presumptively be afforded." *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 37, 39, 102 S.Ct. 38, 44, 46, 70 L.Ed.2d 23 (1981) (Court need only find that Commission's construction of statute is "sufficiently reasonable"); *accord Common Cause v. FEC*, 842 F.2d 436, 448 (D.C.Cir.1988) (deference particularly appropriate in context of FECA, which explicitly relies on the bipartisan Commission as its primary enforcer); *see also FEC v. Ted Haley Congressional Committee*, 852 F.2d 1111, 1115 (9th Cir.1988) (defer to FEC unless demonstrably irrational or clearly contrary to plain meaning of statute); *Orloski v. FEC*, 795 F.2d 156, 164–67 (D.C. Cir.1986) (according FEC's interpretation of the Act "considerable deference").

■ Therefore, the Court will limit its inquiry to whether the FEC's determination that PCD's activity violates the Act is a reasonable one. It will review the FEC determinations: (1) that the "commercial purpose" language contained in the Act includes activity other than direct political solicitations; (2) that PDA's sale of the information gathered from the FEC's reports is among the forbidden commercial purposes; and (3) that PDA's activity does not fall within the media exception embodied in 11 C.F.R. § 104.15(c). Advisory Opinion 1986–25 at 4–5.

### A. Breadth of the "Commercial Purpose" Provision

■ The Court first turns its attention to the FEC's finding that the "commercial purpose" language contained in the Act may be construed to include certain for-profit activity other than direct political solicitation. In light of the legislative his-

tory of the provision, this conclusion appears to be well-founded.

Senator Bellmon offered the present § 438(a)(4) as an amendment on the floor of the Senate while a number of amendments to the Act were being considered in 1974. He stated that the proviso's purpose "is to protect the privacy of the generally very public-spirited citizens who make a contribution to a political campaign or a political party." 117 Cong.Rec. 30057, col. 3 (1971). Senator Bellmon continued:

> We all know how much of a business the matter of selling lists and list brokering has become. These names would certainly be prime prospects for all kinds of solicitations, and I am of the opinion that unless this amendment is adopted, we will open up the citizens who are generous and public spirited enough to support our political activities to all kind of harassment, and in that way tend to discourage them from helping out as we need to have them do.

*Id.* In answer to a question from Senator Nelson, Senator Bellmon further explained:

> In the State of Oklahoma, our own tax division sells the names of new car buyers to list brokers, for example, and I am sure similar practices are widespread elsewhere. This amendment is intended to protect, at least to some degree, the men and women who make contributions to candidates or political parties from being victimized by that practice.

117 Cong.Rec. 30058, col. 1. Senate discussion of the amendment concluded with this exchange:

> MR. NELSON: Do I understand that the only purpose [of the amendment] is to prohibit the lists from being used for commercial purposes?
>
> MR. BELLMON: That is correct.
>
> MR. NELSON: The list is a public document, however.
>
> MR. BELLMON: That is correct.

MR. NELSON: And newspapers may, if they wish, run lists of contributors and amounts.

MR. BELLMON: That is right; but the list brokers, under this amendment, would be prohibited from selling the list or using it for commercial purposes.

*Id.* The amendment passed by a voice vote. *Id.*

Defendant argues that the FEC's interpretation of "commercial purposes" to include PCD's activity is unreasonable. PCD would instead have the Court narrow the FEC's interpretation so that the statute would prohibit only the sale and use of contributor lists by commercial "list-brokers." Def.Mem. I at 17. It cites the above-quoted legislative history for the limited proposition that the Bellmon amendment "was designed to address one specific problem—the sale and use of contributor lists by commercial 'list-brokers'—*and nothing more.*" *Id.* (emphasis added); *see also* Def.Mem. I at 43.

The Court reviews the Commission's determination embodied in Advisory Opinion 1986–25 only for its reasonableness and not for wisdom. PCD's proposed narrower reading is both unpersuasive and unnecessary. A review of all of Senator Bellmon's remarks shows that he was concerned that the reporting provisions would open campaign contributors to a variety of solicitations, not just direct political solicitations. *See* 117 Cong.Rec. 30057, Col. 3, *supra* ("these names would certainly be prime prospects for *all kinds of solicitations*"; "unless this amendment is adopted, we will open up [contributors] to *all kind of harassment*") (emphases added).[7] Under the standards of due deference set forth in *Chevron, supra,* 467 U.S. at 843–44, 104 S.Ct. at 2781–82, and in light of the Senate floor debate recounted above, the Commission's interpretation is eminently reasonable. There is no cause to limit the FEC to PDA's cramped reading of the Act, and the

---

**7.** The Court also notes that when Congress undertook to amend section 438(a)(4) in 1979, it did not disturb the Commission's broad construction of the "commercial purposes" provision, which was in all relevant respects the same as now. Pl.Mem. II at 4 & n. 3 (citing 11 C.F.R. § 104.13 (1977); H.R.Rep. 422, 96th Cong., 1st Sess. 23 (1979), *reprinted in* FEC *Legislative History of the Federal Election Campaign Act Amendments of 1979* (1983) at 207).

Court will not substitute its own judgment for that of the Agency.

### B. PCD Lists and the "Commercial Purposes" Prohibition

■ The FEC has determined in its Advisory Opinion [8] that PCD's sales of its reports violate § 438(a)(4) because they are for a "commercial purpose." The Commission ruled that the company's status as a for-profit corporation raises a presumption of commercial purpose. Advisory Opinion 1986–25, at 4. The FEC noted defendant's "plans to sell its lists to 'all who wish to buy them.'" *Id.* PCD has responded, both during the FEC investigation and during this litigation, that the information is to be marketed and sold primarily to public interest and nonprofit groups, researchers and journalists at low cost. It argues that although nominally for-profit,[9] it has never actually turned a profit on its product, because the lists are provided to nonprofit, nonpartisan groups at a reduced price. *See* Goldman Deposition at 47. The FEC determined that these statements do "not negate this presumption of commercial purpose." Advisory Opinion 1986–25 at 4. The Commission concluded that PCD's activities are proscribed by the "commercial purposes" provision of § 438(a)(4). *Id.*

In *National Republican Congressional Committee v. Legi–Tech Corp.,* 795 F.2d 190, 191 (D.C.Cir.1986), the National Republican Congressional Committee ("NRCC") challenged the activities of defendant's Campaign Contribution Tracking Service, a product much like PCD's, which copied contributor information from the Commission and sold it for a profit. At that time, the FEC had yet to rule on whether such services violate § 438(a)(4), or instead whether they would fall under the media exception carved out by 11 C.F.R. § 104.15(c). The D.C. Circuit specifically left the question open, characterizing the issue as a "gap" which Congress left for the FEC to fill. 795 F.2d at 193; *see Chevron, supra,* 467 U.S. at 843–44, 104 S.Ct. at 2781–82 (Congress explicitly leaving gap for agency to fill constitutes express delegation of authority to elucidate provision by regulation). It noted:

> The record before us fails to identify the subscribers to Legi–Tech's new Tracking Service. Furthermore, we do not know whether the FEC would deem Legi–Tech's communications to be 'similar' to those of a newspaper or how the FEC would apply its 'principal purpose' test to these facts. In light of the deference that must be accorded the FEC's interpretation of its own statute (and indeed its own regulation), any attempt on our part to resolve the present controversy would require judicial speculation as to the Commission's views.

*Legi–Tech, supra,* 795 F.2d at 193.

In the Agency proceedings underlying the instant litigation, the FEC filled that gap. It ruled that "copying and selling compilations comprised primarily of individual contributor names is prohibited by the Act." Advisory Opinion 1986–25 at 5. The Court now inquires whether there are genuine issues of material fact going to whether that resolution is arbitrary, capricious, or contrary to the statute. *Chevron, supra,* 467 U.S. at 844, 104 S.Ct. at 2782. It concludes that there are no such issues.

The Commission is entitled to rely on PCD's for-profit status as an indicator of its commercial purpose. The fact that PCD has not turned a profit on its product at this time does not indicate that it would not in the future, or does not intend to do so. PCD's own Chairman, Dr. Jay Gould, indicated at his deposition that although PDA had not yet been profitable, he was "still hopeful that in the long term it has a very viable future ... PDA is only four years old so we have another possibly five, six years to go." Gould Deposition, at 11; *see id.* at 19–20 ("it would be wonderful if

---

8. The Court refers to PDA and PCD interchangeably when discussing the FEC's findings regarding the reports. PCD's alleged conduct is identical to that proposed by PDA at the time of the request for an advisory opinion, but PCD was not yet formed. PCD is the only named defendant in this action.

9. Defendant also notes that 25% of PDA's shares are owned by the Council on Economic Priorities, a non-profit group whose principal is Jay Gould. Gould is the Chairman of PDA. Gould Dep., at 6.

some day [the burden of raising money for his business] could be alleviated by the prospect of earning revenues, and it's beginning to happen"); *see also* Goldman Deposition at 26 ("we certainly hoped to receive income that would cover the cost of producing this and would have certainly enjoyed any additional income, but we didn't").

Although the Court does not doubt the sincerity of PDA Chairman Gould's stated public-interest orientation,[10] his intent and that of PDA/PCD is not at issue. The critical point, rather, is that the company is engaged in a commercial venture using information copied from FEC reports. The depositions of the principals indicate that the companies formulated a complex pricing schedule and hired marketing consultants to help target likely purchasers. Goldman Deposition at 18–26. While PCD protests that it also gave reports away or sold them at nominal cost to nonprofit organizations, those numbers are quite small: PCD's invoice list names approximately 105 different customers who purchased its reports, whereas PDA president Goldman points out that it gave away reports to 6–12 journalists and "a few" persons in nonprofit or academic settings. Goldman Deposition at 44, 47.

The Commission has made the required showing that there no evidence to support defendant's contention of the unreasonableness of the FEC's conclusion regarding commercial purpose. *Celotex, supra,* 477 U.S. at 323, 106 S.Ct. at 2553.

C. Applicability of the Media Exception to PCD Reports

■ Once the Commission determines that defendant's activity is for a commercial purpose, a potential distributor of FEC contributor information, such as PCD, may attempt to fit under the exception for "newspapers, magazines, books, or other similar communications." 11 C.F.R. § 104.15(c). The FEC considers that the " 'commercial purpose' prohibition does not preclude the communication of contributor information by" news media, so long as that use is "incident to" the sale of these publications. Advisory Opinion 1986–65 at 4.

The FEC ruled that PDA's use of contributor information in its reports "is not merely incident to their sales but is the primary focus of PDA's activity." *Id.* In support of this ruling, the Commission pointed to the fact that the reports are "compilations composed primarily, if not exclusively, of individual contributor information and incorporating nearly all of the identification of individual contributors reported to the Commission...." *Id.* The Commission took notice of defendant's statements that its purpose is to further research and reporting on patterns of political contributions, and noted its placement of the warning on each page of the reports; but the Opinion continued on to say that the FEC "does not view [these factors] as determinative of the principal purpose requirement" of § 104.15(c). *Id.* The FEC reasoned that PCD's lists would have value to list owners, managers brokers and others, and that they are "essentially indistinguishable" from those of a list broker used for soliciting contributions or for commercial purposes. *Id.,* at 4–5.

PCD disputes this finding, maintaining that the commercial value of the lists is

---

**10.** The Certificates of Incorporation of PDA and PCD read in relevant part as follows:

The purposes for which the corporation is formed are: ...

\*     \*     \*     \*     \*     \*

To provide economic information of public interest, taken from federal, state or other public files, and to edit, interpret and disseminate such information in the form of computer printouts, publications, diskettes and on-line retrieval for both private and public sector use.

PDA Certificate of Incorporation, Paragraph SECOND (attached as Exhibit 2 to Plaintiff's Motion for Summary Judgment); PCD Certificate of Incorporation, Paragraph SECOND (attached as Exhibit 8 to Plaintiff's Motion for Summary Judgment).

Dr. Gould indicates that through this business he wishes to foster greater public access to information regarding the interrelationships among donors, corporations, and congressional districts. He is interested in the issue of campaign finance from a public policy perspective. Gould Dep. at 21, 24, 26.

severely diminished, if not destroyed, by the omission of street addresses from the list,[11] the "salting" provisions of the reporting requirement,[12] and the warnings on each page that the information contained therein is not to be reproduced for commercial purposes.

The Court finds no factual question concerning the reasonableness of the Commission's conclusion that the FEC contributor information contained in PCD's reports is not incident to the sales but is the primary focus. Donor lists are an extremely valuable asset to political committees, "created through an expensive and laborious process of targeting and soliciting likely contributors." *Legi–Tech, supra,* 795 F.2d at 191 (referring to plaintiff NRCC's donor list as its "principal business asset"); *see also* Affidavit of Wyatt A. Stewart III, Director of Finance and Administration Division, National Republican Congressional Committee (Attached as Exhibit 25 to Plaintiff's Reply Mem.) (hereinafter "Stewart Aff."), at ¶¶ 9–14 (describing multi-step process of developing and protecting NRCC's mailing lists); Babcock, "Mailing Lists of '88 Contributors are Future Assets for Kemp, Robertson," Washington *Post,* March 13, 1988, at A14 (Attached as Exhibit 26 to Pl.Mem. II) (referring to donor lists in the 100,000–name range as "tangible asset[s]" of a campaign committee). Sixty-four of the 105 reports that PCD sold were issued directly to campaign committees of political parties or candidates, and another eight went to political consultants. These two categories alone constituted two-thirds of PCD's customers. Summary of PCD Purchasers, Annexed as Attachment 2 to Affidavit of Shelley Garr, FEC Paralegal Specialist, at 1.[13] The FEC has submitted uncontested evidence that several of the twenty-six PCD customers which the Commission was able to contact did in fact purchase the lists for solicitation purposes. One PCD customer, the Secretary and Treasurer of a political campaign committee, indicated in response to an FEC subpoena that the lists were not used for solicitation purposes because fundraising became unnecessary after the list was received in August 1986; however, he indicated that the lists "would have been used to solicit money for future campaigns." Letter of Fred Baier, Jr. to Lawrence M. Noble, General Counsel, FEC, dated June 24, 1988 (attached as Exhibit 13 to Plaintiff's Motion for Summary Judgment). Another customer, of unstated relationship to the Democratic Party, indicated that he purchased PCD product in the hope that it "might prove useful in support of the party's fundraising efforts." He ultimately decided not to use the information for solicitation purposes. He noted the disclaimer, the absence of mailing addresses, and the fact that only large contributors ($500 or more) were listed and that those people were for the most part already known to the Party or were Republicans who could not be expected to provide funds to the party. Letter of Robert F. Bauer, Counsel to Hal Kilshaw, to Lawrence M. Noble, General Counsel, FEC, dated August 4, 1988, at 2.

11. PCD apparently never received the addresses of contributors from the FEC. Defendant's response to Interrogatories before the FEC, ¶ 2 n. 1, dated June 6, 1987 (attached as Exhibit 11 to Plaintiff's Motion for Summary Judgment).

12. In 1980 Congress added a "salting provision," which appears in the final two sentences of the current version of § 438(a)(4). That amendment provides:

A political committee may submit 10 pseudonyms on each report filed in order to protect against the illegal use of the names and addresses of contributors, provided such committee attaches a list of such pseudonyms to the appropriate report. The Clerk, Secretary, or the Commission shall exclude these lists from the public record.

*See* Pub.L. 96–187, § 109 (1980). The amendment "allows a committee to 'salt' the reports it files under the Act as a means of determining whether the names and addresses of its contributors are being used illegally." H.R.Rep. No. 96–422, 96th Cong., 1st Sess. 23–24 (1979), U.S. Code Cong. & Admin.News 1979, pp. 2883, 2884.

PCD argues that the FEC has not been able to point to a single instance where a pseudonymous entity received a solicitation as a result of the distribution of PCD reports.

13. Defendant does not challenge Garr's categorization of any of these customers. The Court notes that these numbers do not reflect the 6–12 reports that were provided to journalists, and the "few" others that went to academics or nonprofit organizations *gratis.*

Defendant proffers the testimony of the journalist Edward Zuckerman and political consultant John Podesta in support of the proposition that using PCD's reports for political or commercial solicitations would not be economically feasible. Affidavit of Edward Zuckerman, Editor and Publisher of *PACs & Lobbies*, attached as Exhibit 8 to Defendant's Motion for Summary Judgment, (hereinafter "Zuckerman Aff."), at ¶¶ 19–20; Affidavit of John D. Podesta, Vice President and General Counsel, Podesta Associates, Inc., attached as Exhibit 8 to Defendant's Motion for Summary Judgment (hereinafter "Podesta Aff."), at ¶ 11. The Court considers this testimony as speculative, because Zuckerman is not a political fundraiser and Podesta does not have first-hand experience working with PCD reports. Zuckerman Aff., ¶¶ 1–4; Podesta Aff. ¶ 8. Such speculation is, of course, insufficient to raise genuine issues of fact. *Matsushita Electric Industrial Co., supra,* 475 U.S. at 586, 106 S.Ct. at 1355. Moreover, even accepting their testimony as true, the theory for which it stands does not defeat plaintiff's summary judgment motion. The mere availability of cheaper and more accessible substitutes would not excuse PCD's product from compliance with § 438(a)(4) if it were otherwise prohibited under the statute.

For summary judgment purposes, the uncontested record supports as reasonable the Commission's conclusion that PCD's product does not fall under the § 104.15(c) exception. Any inherent limitations on the reports' commercial value can be easily overcome using techniques common in fundraising circles. For example, the miss-

ing addresses and phone numbers from PCD's lists may be supplied from other sources. PCD's Answers to Interrogatories, attached as Exhibit 11 to Plaintiff's Motion for Summary Judgment, at 10.[14] Also, PCD reports may be used as a cross-check to update and correct other lists. Goldman Deposition at 52 (PCD corrected transposed zip codes and standardized corporate spellings and other information); Advisory Opinion 1986–25 at 4–5; *see also FEC v. American International Demographic Services Inc.,* 629 F.Supp. 317 (E.D.Va.1986) ("commercial purpose" provision prohibits copying and selling lists incorporating nearly all identification information, because of comparison value); Advisory Opinion 1985–16 (use of contributor information to update or correct solicitation or mailing lists or otherwise to enhance their commercial value prohibited). Similarly, the lists have value in that they may be used to remind fundraisers of potential donors whose addresses they already know. FEC Exhibit 18 at 24–25.[15]

The "salting" provisions are not of much assistance to PCD's argument because of the small numbers involved. Of the approximately 250,000 contributions that were reported to the FEC during the 1983–84 election cycle, the period which PCD's lists covered, each committee could use only a maximum of 10 such names, and some used none. Pl.Mem. II at 7 n. 5 (citing 2 U.S.C. § 438(a)(4)). Therefore, the likelihood of any such "seed" appearing on a PCD list was relatively small.

The fact that non-fundraisers might also find PCD's lists to be useful is quite beside the point.[16] Even giving the benefit of the

---

**14.** PCD so states in its answers to interrogatories; but its Chairman, Jay Gould, indicates that in his opinion it would be very difficult and uneconomical to match the names on PCD reports, which are organized by Congressional District and zip code, with the telephone book, which is otherwise organized. Gould Dep., at 76–78, 81–83.

**15.** There is also uncontested evidence on the record that PCD's marketing agent targeted groups which perform substantial political solicitation activities. These "obvious key markets for PDA data" included committees registered with the FEC; state and local candidates; in-

cumbent office holders; and lobbyists/trade groups/party committees. The fifth group was Baron Report/Cook Political Report/CQ subs. Memorandum of Sean Strub, Strub/Collins Inc., to Mike Tanzer, principal of PDA, dated May 21, 1986 (attached as Exhibit 22 to Plaintiff's Motion for Summary Judgment, at 1.) The Court cannot but conclude that even PCD's own marketing consultants believed that these data would be useful for commercial and/or solicitation purposes.

**16.** One academic has submitted an affidavit on behalf of defendant indicating that, although he himself has not used PCD reports in his political

doubt to the testimony of defendant's witnesses, as is required on plaintiff's summary judgment motion, the mere fact that the reports could be used for a non-violative purpose does not raise a genuine issue of fact as to whether they are prohibited under § 438(a)(4). Regardless of to whom PCD prefers or anticipates selling its reports, the record indicates that most of PCD's customers were in fact political consultants, campaigns or committees, and that relatively few were academics or journalists. PCD Customer List, attached as Exhibit 12 to Plaintiff's Motion to Dismiss. The Court is not even so much concerned with whether the campaign committees that received PCD reports actually used the lists for solicitation purposes; more to the point is these entities' predominance among PCD customers, which belies PCD's statement that the reports are of interest "only to those involved in analyzing the role of contributions in the political process." Def.Mem. I at 8; *see* Def.Mem. II at 21.

Moreover, examining the legislative history, the Court is unable to say as a matter of law that the Commission's construction of the media exception as not including PCD's activity is unreasonable. The Commission construes § 104.15(c) to except media use of contributor information in such contexts as news stories, commentaries, or editorials. *Id.* (citing 117 Cong.Rec. S30,058 (daily ed. Aug. 5, 1971) (remarks of Sen. Nelson), *reprinted in* FEC, *Legislative History of the Federal Election Campaign Act of 1971* at 582 (1981) and *Legi-Tech, supra*). Turning again to the transcript of the Senate floor debate, Senators Nelson and Bellmon expressed the view that despite the prohibition on commercial

use of contributor information, newspapers ought to be able to present this information to the public. 117 Cong.Rec. S 30058. The Commission concluded that the PCD reports, which virtually duplicate the FEC files *verbatim,* do not principally serve the purposes contemplated in the legislative history of the amendment. There are no factual issues which would prevent the Court from holding that this conclusion is reasonable, and the Court declines to disturb the FEC's determination in this respect.

III. Constitutional Challenges [17]

A. First Amendment

◼ PCD's First Amendment challenge is directed at § 438(a)(4). Defendant argues that any prohibition on publishing contributor lists, such as the one found here for commercial purposes, is an "unlawful restraint on publishing lawfully obtained truthful information...." Def. Mem. I at 24 (citing *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 101–02, 99 S.Ct. 2667, 2669–70, 61 L.Ed.2d 399 (1979); *Landmark Communications Inc. v. Virginia,* 435 U.S. 829, 838, 98 S.Ct. 1535, 1541, 56 L.Ed.2d 1 (1978); *Oklahoma Publishing Co. v. District Court,* 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977); *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 495, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975)); Def.Mem. II at 3 (citing *The Florida Star v. B.J.F.,* 491 U.S. 524, 109 S.Ct. 2603, 2607–13, 105 L.Ed.2d 443 (1989)).

It is well-settled that commercial speech is subject to diminished first-amendment protection. "Communication in a commercial setting may be subjected to regulation that ordinarily would be impermissible in a

---

science research, the reports could be of value to academics who study patterns of contributions in federal elections. Affidavit of Dr. Herbert Alexander, attached as Unnumbered Exhibit to Defendant's Motion for Summary Judgment (hereinafter "Alexander Affidavit,") at ¶¶ 13, 14. On the other hand, another of PCD's academician-customers who was contacted by the Commission did not find the reports particularly interesting or useful, and therefore discarded them. FEC Exhibit 13 at 15.

Defendant also submitted the affidavit of a journalist who indicated that the PCD reports

were "invaluable" in his field, and gave several examples of how they could be used by journalists for non-commercial purposes. Zuckerman Aff. at ¶¶ 9, 13–14, 17 *et passim.* Similarly, PCD submitted an affidavit from a political consultant who indicates that although he himself has not used PCD reports, he is of the opinion that PCD reports could be useful in conducting opposition research. Podesta Aff. at ¶¶ 7–10.

17. The Court considers these issues *de novo.*

public forum." *Lowe v. SEC*, 472 U.S. 181, 182, 105 S.Ct. 2557, 2559, 86 L.Ed.2d 130 (1985) (citing *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978)). The Supreme Court has recognized that the Government "does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Ohralik, supra*, 436 U.S. at 456, 98 S.Ct. at 1918.

Under this lower standard, PCD cannot successfully invoke First Amendment protection for its reports. The cases upon which PCD primarily relies are distinguishable in that they stand for the rights of traditional news organizations against various state interests that sought to enjoin widespread publication of certain information. *See, e.g., Smith v. Daily Mail Publishing Co., supra*, 443 U.S. at 101–102, 99 S.Ct. at 2669–2670 (state cannot forbid newspapers from publishing otherwise public name of youth charged as juvenile offender); *Oklahoma Publishing, supra*, 430 U.S. at 311, 97 S.Ct. at 1047 (similarly); *Cox Broadcasting, supra*, 420 U.S. at 495, 95 S.Ct. at 1046 (reversing judgment of liability against news reporter for disclosing rape victim's name, obtained from publicly-available court files); *Florida Star, supra*, 109 S.Ct. at 2607 (similarly). Here, by contrast, the Commission specifically provides for traditional news media to publish the information contained in FEC files so long as the use of that information is "incident to the sale of such communications," and the "principal purpose" of the communications is not to communicate any contributor information for solicitation or other commercial purpose. 11 C.F.R. § 104.15(c).[18]

18. Obviously, this distinction is contingent on the outcome of PCD's Equal Protection challenge, based on the Commission's differential treatment of PCD and the "traditional media," *post.*

19. PCD remarks that this interest is "much too weak to justify a blanket restraint on speech." Def.Mem. I at 26. However, the provision provides no such "blanket restraint," as is evidenced by the final substantive passage of the Advisory Opinion, which provides as follows:

The purpose of the statute, as discussed *ante*, is to prevent harassment of political contributors as a result of the Act's disclosure provisions. In enacting FECA, which seeks to enhance the integrity of the electoral process, Congress struck a delicate balance between competing considerations of public disclosure, privacy and free speech. *Buckley v. Valeo*, 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976). The Court recognized that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Id.* Congress has required committees to report the names of contributors, and the Court has upheld that provision against challenges based on privacy of association and belief. *Id.* Recognizing the potential associational and privacy concerns connected with such a disclosure requirement, it is certainly rational for Congress to limit certain uses of that information through the Bellmon Amendment.

PCD emphasizes the ease with which a contributor may discard any such unwanted solicitations as might result from commercial publication of the FECA lists. *See, e.g.*, Def.Mem. I at 26 (describing the interest in freedom from the nuisance of having to throw away unwanted commercial solicitations as "trivial" and "weak").[19] This formulation of the issue misses the point. As Senator Bellmon observed, contributors might be dissuaded from making any such contributions if they knew that their identities would be reported to a governmental clearinghouse for sale to other hopefuls.

The provision serves rational economic ends as well. Through this provision, Congress expressed its legitimate concern that a contribution to one political committee

> PDA's use of the contributor information in its database for academic research projects may be permissible, as long as this activity does not involve the sale or use of contributor information for the purpose of soliciting contributions or for other commercial purposes. [Citations omitted] Since PDA has not described a specific research project, however, this opinion should not be relied upon as approving any particular research activity. [citations omitted].
> Advisory Opinion 1986–25 at 5.

represents one fewer contribution to another. *See* Pl.Mem. II at 20 n. 17 ("the more times a donor is solicited and donates the less likely that donor is to give again") (citing Stewart Aff., at ¶ 15; Huntsinger, "Direct Mail: Sweeping Changes Since 1969," *Fundraising Management,* April 1989, at 64–66 (referring to direct mail fundraising as a "finite market")). It is perfectly reasonable for Congress to prohibit private businesses from using this information to the detriment of the committees who report to the FEC under mandate. This "zero-sum" situation distinguishes the present facts from those in the cases cited by defendant. *See, e.g., Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988) (striking down ban on mailings by lawyers to consumers); *Consolidated Edison Co. v. Public Service Comm'n of New York,* 447 U.S. 530, 542, 100 S.Ct. 2326, 2336, 65 L.Ed.2d 319 (1980) (overturning order which forbade utilities from including "bill inserts" addressing public issues); *Lamont v. Commissioner of Motor Vehicles,* 269 F.Supp. 880 (S.D. N.Y.) (denying attempt to enjoin Commissioner of Motor Vehicles to sell automobile registration records to potential advertisers), *aff'd,* 386 F.2d 449 (2d Cir.1967), *cert. denied,* 391 U.S. 915, 88 S.Ct. 1811, 20 L.Ed.2d 654 (1968).

Moreover, there are many other available routes by which this information circulates. The Commission supplies the information free of charge to all comers; it permits traditional media sources to publish the information if it is incident to their profit-making activities; and the Commission permits unrestricted use or sale of contributor information copied from its files for academic research, "criticism, comment, [and] news reporting." Pl.Mem. I at 30 (quoting *Legi–Tech, supra,* 795 F.2d at 192); Advis-

ory Opinion 1986–25 at 5. Commercially-oriented firms may also obtain this information themselves from the reporting committees, on whatever terms they choose to negotiate, and do with that information what they will.[20]

There is no factual issue precluding this Court from holding that the "commercial purposes" provision serves a rational purpose and does not impermissibly infringe on any cognizable free speech rights.

## B. Equal Protection

■ The FEC has promulgated a regulation excepting newspapers, magazines, books or other similar communications from the proscription on use or sale of the information collected in the political contributor lists. 11 C.F.R. § 104.15. The rule allows these traditional media sources to use the information so long as the use is "incident to the sale of such communications," and the "principal purpose" of the communications is other than to communicate contributor information for solicitation or other commercial purpose.[21] *Id.* (citing 117 Cong.Rec. S30,058 (daily ed. Aug. 5, 1971) (remarks of Sen. Nelson), *reprinted in* FEC, *Legislative History of the Federal Election Campaign Act of 1971* 582 (1981); *Legi–Tech, supra,* 795 F.2d at 192). If the principal object of such communications is to communicate contributor information for solicitation or other commercial purpose, the use is impermissible. *Id.* The FEC ruled that PDA's intended use of contributor information does not fall into the "newspapers, magazines, books or other communications" exception promulgated in 11 C.F.R. § 104.15(c), because the lists are not merely incident to their sales but are

---

**20.** Additionally, the Commission expressly permits a political committee to post copies of reports of receipts and expenditures which were filed with the Commission, Advisory Opinion 1988–2 [¶ 5910], 2 Fed.Elec.Camp.Fin. Guide (CCH) [¶ 5910], and permits candidates for federal office to contact individual contributors listed on the reports filed by a political committee to inform them that the committee was unauthorized. Advisory Opinion 1984–2, *reprinted in* 2 Fed.Elec.Camp.Fin. Guide (CCH)

¶ 5748 (Feb. 14, 1984). It also permits candidates to use FEC lists to contact an opponent's contributors to correct allegedly defamatory statements made by the opponent. Advisory Opinion 1981–4, 1 Fed.Elec.Camp.Fin. Guide (CCH) [¶ 5590].

**21.** This distinction was found appropriate in *Legi–Tech, supra,* and codified at 11 C.F.R. 104.-15(c).

the primary focus of PDA's activity. *Id.* at 4.

PCD challenges the constitutionality of the regulation from the standpoint of the Equal Protection Clause of the Fourteenth Amendment, as back-incorporated against the Federal Government by the Fifth Amendment Due Process Clause. *Johnson v. Robison*, 415 U.S. 361, 364 n. 4, 94 S.Ct. 1160, 1164 n. 4, 39 L.Ed.2d 389 (1974). It contends that by allowing traditional media sources to publish information reported to the FEC while forbidding non-media firms from doing the same, the Agency is engaging in constitutionally impermissible favoritism. It cites several cases for the proposition that the government "may not grant the use of a forum to people whose views its [sic] finds acceptable, but deny use to those wishing to express less favored or more conventional views." Def.Mem. I at 36 (quoting *Carey v. Brown*, 447 U.S. 455, 461–62, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980); and citing *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 785–86, 98 S.Ct. 1407, 1420–21, 55 L.Ed.2d 707 (1978); *Consolidated Edison, supra*, 447 U.S. at 537–38, 100 S.Ct. at 2333–34). PCD also contests the Commission's ability evenhandedly to determine the publisher's "principal purpose," citing cases for the proposition that the Government should not be in the business of examining the content of publications. Def.Mem. I at 38. Finally, PCD argues that the press should enjoy no greater access to government information than that of the general public. *Id.,* 39–40.

At the outset the Court notes that even if it were to find PCD's Equal Protection arguments availing, such would not necessarily help PCD. For if the Court were to strike down the newspapers exception to § 438(a)(4), the proscription on "commercial purposes" use would remain intact. PCD's argument, if successful, might only stop newspapers from publishing this information, and would not necessarily establish PCD's right to sell the information.

In any event, the Court would find the Equal Protection arguments unavailing. The Supreme Court recently upheld a me-

dia exemption to a state statute prohibiting the expenditure of general corporate treasury funds on candidate elections. *Austin v. Michigan Chamber of Commerce*, —— U.S. ——, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), presented a challenge to the State of Michigan's Campaign Finance Act. That Act, *inter alia*, prohibited corporations from expending general treasury funds for independent expenditures in support of political candidates. The Act excluded from the definition of "expenditure" any "expenditure by a broadcasting station, newspaper, magazine, and other periodical or publication for any news story, commentary, or editorial in support of or opposition to a candidate for elective office ... in the regular course of publication or broadcasting." *Id.* 110 S.Ct. at 1401 (citing Mich.Comp.Laws § 169.206(3)(d)) (footnote omitted). The Court, applying a "compelling state purpose" test, upheld the disparate treatment. It reasoned that

> media corporations differ significantly from other corporations in that their resources are devoted to the collection of information and its dissemination to the public. We have consistently recognized the unique role that the press plays in 'informing and educating the public, offering criticism, and providing a forum for discussion and debate.'

*Id.* 110 S.Ct. at 1401–02 (quoting *Bellotti, supra*, 435 U.S. at 781, 98 S.Ct. at 1418) (other citation omitted). The Court concluded that the media exemption from the campaign expenditure law does not offend the Equal Protection Clause:

> A valid distinction thus exists between corporations that are part of the media industry and other corporations that are not involved in the regular business of imparting news to the public.

*Id.* 110 S.Ct. at 1402.

The Court finds this analysis equally applicable to the case at bar. The provision at issue imposes fewer restrictions on the expression of traditional media businesses than on certain other businesses, namely, PCD's report-selling operation. This distinction, however, is justified by a compelling governmental interest in assuring that

the disclosure purposes of the Act are not frustrated by the protective device of § 438(a)(4). Like in *Austin*, the press in this case plays a "unique role" in the context of campaign finance, "informing and educating the public, offering criticism, and providing a forum for discussion and debate." *Id.* 110 S.Ct. at 1402. These concerns have already been upheld by the Supreme Court as substantial governmental interests. In *Buckley v. Valeo, supra*, 424 U.S. at 60–85, 96 S.Ct. at 654–666, the Court identified these interests as follows:

> First, disclosure provides the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters in evaluating those who seek federal office.
>
>    \*      \*      \*      \*      \*      \*
>
> Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity.
>
>    \*      \*      \*      \*      \*      \*
>
> Third, and not least significant, record-keeping, reporting and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations described above.

*Id.* at 66–68 (citations and footnotes omitted).

It is constitutionally permissible for Congress and the FEC to have concluded that these interests would be thwarted if media were not excepted from § 438(a)(4), but are not substantially threatened by the exclusion of other publication of contributor information for commercial purposes. Accordingly, the rule excepting traditional media from § 438(a)(4) satisfies substantial governmental interests.

None of the defendant's theories convince the Court otherwise. The cases it cites in support of its first and second theories are all distinguishable in that the statutory schemes there in question look to the nature of the communication in granting the use of a forum to a specific class of speakers. *See, e.g., Carey v. Brown, supra*, 447 U.S. at 462–63, 100 S.Ct. at 2291 (striking down statute prohibiting picketing of residences but exempting peaceful labor disputes); *First National Bank v. Bellotti, supra*, 435 U.S. at 784, 98 S.Ct. at 1420 (state may not prohibit corporations from communicating to public its views not "materially affecting" corporate business); *Consolidated Edison, supra*, 447 U.S. at 537–38, 100 S.Ct. at 2333–34 (declaring unconstitutional Public Service Commission order prohibiting inclusion in monthly utility bills of inserts discussing "political matters"); *FCC v. League of Women Voters of California*, 468 U.S. 364, 383, 104 S.Ct. 3106, 3119, 82 L.Ed.2d 278 (1984) (striking down scheme requiring agency to determine whether a television program editorializes on "controversial issues of public importance"); *Arkansas Writers' Project v. Ragland*, 481 U.S. 221, 229, 107 S.Ct. 1722, 1727, 95 L.Ed.2d 209 (1987) (invalidating scheme which required tax commissioner to determine which publications were exempted from tax scheme based on content).

By contrast, nothing in the rules challenged here obligates the Commission to examine the contents of publications disclosing campaign finance information gleaned from FEC files. The Commission's "principal purpose" inquiry involves no substantive examination of the reports. In making the "principal purpose" determination in the present case, the Commission looked to solely non-content-based criteria, including, *inter alia*: (1) the corporation's for-profit status; (2) PCD's clientele, both actual and potential; and (3) PCD's willingness to sell reports to anyone who would pay their fees. *See generally* Advisory Opinion 1986–25. None of these bases involve the government "in the business of examining the content" of the reports (which, the Court additionally notes, express no political viewpoint whatsoever). Accordingly, the cited cases are inapposite.

PCD's third Equal Protection theory must also fail because under certain circumstances, the government may accord

the press special privileges over members of the general public. *See Austin, supra,* 110 S.Ct. at 1401, and accompanying discussion; *see also Buckley v. Valeo, supra,* 424 U.S. at 93 n. 127, 96 S.Ct. at 670 n. 127 (citations omitted) (special news media protections "the rule, not the exception"); *cf. Readers Digest Assn. v. FEC,* 509 F.Supp. 1210 (S.D.N.Y.1981) (press exemption only applies to normal press functions; other political activities by institutional press subject to Act's restrictions). For the reasons discussed above, those circumstances are satisfied here.

In sum, the exemption of traditional media organizations embodied in the regulations at issue here fulfills a substantial governmental interest and does not offend the Equal Protection clause. The Court accordingly denies summary judgment to defendant PCD on its Equal Protection defense and grants summary judgment to the plaintiff FEC on its claims.

CONCLUSION

For the reasons stated above, the Court declines to disturb the FEC's determination that PCD's sale of its reports are proscribed by 2 U.S.C. § 438(a)(4). It also rejects PCD's First and Fifth Amendment challenges to that provision and 11 C.F.R. 104.15(c).

The Court accordingly DENIES defendant's summary judgment motion in its entirety; and it GRANTS plaintiff's motion for summary judgment in full.

Settle Order Accordingly.