**FEDERAL ELECTION COMMISSION,**
Plaintiff–Appellee,

v.

**POLITICAL CONTRIBUTIONS DATA,**
INC., Defendant–Appellant.

**No. 1779, Docket 91–6084.**

United States Court of Appeals,
Second Circuit.

Argued July 8, 1991.

Decided Aug. 21, 1991.

Richard B. Bader, Associate Gen. Counsel, Washington, D.C. (Lawrence M. Noble, Gen. Counsel, Vivien Clair, Federal Election Com'n, of counsel), for plaintiff-appellee.

David C. Vladeck, Washington, D.C. (Public Citizen Litigation Group, Alan B. Morrison, Vladeck, Waldman, Elias & Engelhard, Anne C. Vladeck, New York City of counsel), for defendant-appellant.

Mitchell H. Bernstein, Washington, D.C. (Skadden, Arps, Slate, Meagher & Flom, Thomas J. Casey, Roberto Iraola, of counsel), for amicus curiae Legi–Tech, Inc.

Before MESKILL, NEWMAN and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

It is a cardinal principle of statutory construction that congress is presumed to have passed statutes which are constitutional. Thus, we are obliged to construe statutes to avoid constitutional problems whenever possible. *See, e.g., DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const.,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988); *Lowe v. Securities and Exchange Comm'n,* 472 U.S. 181, 207, 105 S.Ct. 2557, 2571, 86 L.Ed.2d 130 (1985) ("the apparent intent of Congress [was] to keep the Act free of constitutional infirmities"); *Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 211, 39 L.Ed. 297 (1895) ("every reasonable construction must be resorted to, in order to save a statute from unconstitutionality"). Moreover, when congress indicates that its goal in passing a statute is to *avoid* constitutional problems, our task is made easier. This is such a case.

Congress passed the Federal Election Campaign Act of 1971 ("FECA", or "the act") in order to, *inter alia,* require disclosure of campaign contributions and contributors. Congress determined that this disclosure was necessary in order to inform the electorate where campaign money comes from, to deter corruption, and to effectively enforce the act's contribution limitation requirements. *See generally Buckley v. Valeo,* 424 U.S. 1, 66–68, 96 S.Ct. 612, 657–58, 46 L.Ed.2d 659 (1974).

The FECA's broad disclosure requirements, as well as the legislative history of the act, indicate that the FECA holds, as its overarching philosophy, the principle that "[p]ublicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best disinfectant; electric light the most efficient policeman." Brandeis, *What Publicity Can Do,* Harper's Weekly, Dec. 20, 1913, at 10 (quoted in Senate Comm. on Commerce, Federal Election Campaign Act of 1971, S.Rep. 96, 92d Cong., 2d Sess. (additional views of Sen. Griffin), *reprinted in* 1972 U.S.Code Cong. & Admin.News 1773, 1816).

Today, we are faced with the FEC's attempt to limit the FECA's broad disclosure requirements through the "commercial purposes" restriction contained in 2 U.S.C. § 438(a)(4). Specifically, we must decide whether the defendant, a corporation which produces campaign contribution reports to

sell to the public, "sold or used" information culled from the FEC in violation of § 438(a)(4). Since we answer that question in the negative by reading the statute in a manner that avoids the first amendment problems that the FEC's interpretation would engender, we not only further the intent of congress, but also need not reach the "important and troubling First Amendment implications raised by any construction of the statute that bars the use of the information at issue in this case by organizations such as" the defendant. *National Republican Cong. Comm. v. Legi–Tech Corp.*, 795 F.2d 190, 194 (D.C.Cir.1986) (Wright, J., concurring) (hereinafter "*NRCC*").

### LEGISLATIVE HISTORY OF § 438(a)(4)

The § 438(a)(4) "commercial purposes" exception was proposed as an amendment to that section by Senator Bellmon of Oklahoma:

> Mr. President, the purpose of this amendment is to protect the privacy of the generally very public-spirited citizens who may make a contribution to a political campaign or a political party. We all know how much of a business the matter of selling lists and list brokering has become. These names would certainly be prime prospects for all kinds of solicitations, and I am of the opinion that unless this amendment is adopted, we will open up the citizens who are generous and public spirited enough to support our political activities to all kinds of harassment, and in that way tend to discourage them from helping out as we need to have them do.

117 Cong.Rec. 30,057 (daily ed. Aug. 5, 1971) (statement of Sen. Bellmon). Senator Bellmon's amendment was grudgingly accepted by the bill's sponsor, Senator Cannon, who replied:

> Mr. President, this is certainly a laudable objective. I do not know how we are going to prevent it from being done. I think as long as we are going to make the lists available, some people are going to use them to make solicitations. But as far as it can be made effective, I am willing to accept the amendment, and I yield back the remainder of my time.

*Id.* (statement of Sen. Cannon). Senator Bellmon went on to give an example of the evils he was attempting to combat with his amendment:

> MR. BELLMON. * * *.
>
> In the State of Oklahoma, our own tax division sells the names of new car buyers to list brokers, for example, and I am sure similar practices are widespread elsewhere. This amendment is intended to protect, at least to some degree, the men and women who make contributions to candidates or political parties from being victimized by that practice.
>
> MR. NELSON. Do I understand that the only purpose is to prohibit the lists from being used for commercial purposes?
>
> MR. BELLMON. That is correct.
>
> MR. NELSON. The list is a public document, however.
>
> MR. BELLMON. That is correct.
>
> MR. NELSON. And newspapers may, if they wish, run lists of contributors and amounts.
>
> MR. BELLMON. That is right; but the list brokers, under this amendment, would be prohibited from selling the list or using it for commercial solicitation.

*Id.* at 30,058.

### FACTS AND BACKGROUND

The Federal Election Commission ("FEC" or the "commission") is the independent agency of the United States government charged with the administration, interpretation, and civil enforcement of the FECA. *See* 2 U.S.C. §§ 437c(b)(1), 437d(a) & (e), 437f, 437g. FEC is specifically authorized to formulate policy under the act. 2 U.S.C. § 437c(b)(1). One of FEC's responsibilities is to serve as a clearinghouse for all campaign finance reports and statements filed under the requirements of the FECA. 2 U.S.C. §§ 432(g), 438(a)(10).

FEC maintains a computerized database which contains much of the financial information reported to the commission. This database can be searched by, *inter alia*, contributor's name, hometown, zip code, or employer. The public may obtain computer

printouts of such searches and may also purchase magnetic computer tapes containing contributor information. During the 1987 calendar year, FEC received more than 70,000 such requests for information.

Defendant Political Contributions Data, Inc. ("PCD") is a New York corporation which is wholly owned by Public Data Access, Inc. ("PDA"), another New York corporation. PDA, in turn, is owned by its employees, private investors, and non-profit groups. PCD was formed in order to assemble and disseminate FEC data at a profit. In the words of Benjamin A. Goldman, an executive vice-president of PDA, PCD's compilations of FEC data "show how financial contributions support the current political superstructure, particularly with respect to the advantage enjoyed by incumbents over challengers." According to Goldman, these reports "facilitate research into the reason why contributors, both as individuals and on behalf of their affiliated companies, favor one candidate or another, particularly in light of their congressional committee assignments."

PCD marketed two standard reports. One, a "corporate affiliation contributor report", analyzed the contributions made by officers and upper-level employees of the 700 largest United States corporations. The other, a "congressional district report", listed the name of each major ($500.00 and up) contributor located within each of the country's 435 congressional districts, along with the recipient of the contribution, the contributor's occupation, and the amount of each donation. In addition, PCD occasionally compiled and sold the results of special computer searches, consisting of a short list of names and contributions.

None of PCD's reports contained the mailing addresses or phone numbers of contributors. Each page of each PCD report contained this warning:

THIS REPORT MAY NOT BE USED OR SOLD BY ANY PERSON FOR THE PURPOSE OF SOLICITING CONTRIBUTIONS OR FOR ANY COMMERCIAL PURPOSE.

PCD's promotional brochure repeated this caveat and added: "Users must understand that under FEC regulations the use of FEC data for fund raising is strictly forbidden, and that the FEC records are probably 'seeded' to detect such unwarranted usage."

The "seed" warning refers to the second sentence of 2 U.S.C. § 438(a)(4) (commonly known as the "salting" provision), which allows political committees to

submit 10 pseudonyms on each report filed in order to protect against the illegal use of names and addresses of contributors, provided such committee attaches a list of such pseudonyms to the appropriate report. The Clerk, Secretary, or the Commission shall exclude these lists from the public record * * *.

As of June 6, 1987, PCD had sold approximately 100 reports, ranging in price from $5.00 (for one report) to $776.25 (for a combination of reports). They had billed $9,398.76 and had received $4,544.73 for their products as of that date. PCD's chairman, Jay Gould, was nevertheless "still hopeful that in the long term [PCD] has a very viable future", as he indicated at his deposition.

On August 15, 1986, in response to a request from PDA, the FEC issued advisory opinion 1986–25, in which the FEC concluded that

PDA's proposed activity that involves the copying and selling of compilations comprised primarily of individual contributor names is prohibited by the Act. PDA's use of the contributor information in its database for academic research may be permissible as long as this activity does not involve the sale or use of contributor information for the purpose of soliciting contributions or for other commercial purposes. See, 11 CFR 104.15(c); Advisory Opinion 1985–16.

PDA thereafter formed PCD as a subsidiary, and PCD continued to market the contributor lists.

In November 1986 the National Republican Congressional Committee ("NRCC") filed an administrative complaint with the FEC alleging that PCD's sale and use of

information filed with the commission by NRCC and others violated § 438(a)(4) of the act. After conducting an investigation, the FEC found "probable cause to believe" that PCD had violated § 438(a)(4). The FEC and PCD were unable to settle their dispute without judicial intervention, and on July 25, 1989 the FEC filed a civil enforcement suit against PCD in the Southern District of New York.

After discovery, the parties filed cross-motions for summary judgment. In an opinion reported at 753 F.Supp. 1122 (S.D.N.Y.1990), Judge Kram granted the FEC's motion. First, Judge Kram determined that the commission's construction of § 438(a)(4) was a reasonable one, and accepted the commission's determinations (1) that the "commercial purposes" language of the act prohibited more than just direct political solicitations; (2) that PCD's sale of the information was among the prohibited "commercial purposes"; and (3) that PCD's activities did not fall within the "media exception" of 11 C.F.R. 104.15(c). 753 F.Supp. at 1126–32.

Since Judge Kram found that PCD's activities were prohibited by the terms of § 438(a)(4), she then addressed PCD's constitutional challenges to the statute, none of which she found compelling. 753 F.Supp. at 1132–37.

The judgment entered in favor of the commission (1) declared that PCD had violated § 438(a)(4), (2) imposed a civil penalty of $5,000.00 on PCD, and (3) permanently enjoined PCD from "selling or using for the purpose of soliciting contributions or for commercial purposes any information copied from reports and statements filed with the Federal Election Commission pursuant to the Federal Election Campaign Act of 1971".

PCD has renewed each of its arguments on appeal.

### DISCUSSION

Although this is an appeal from a summary judgment, there is no dispute between the parties over any material fact. The only dispute is the application of § 438(a)(4) of FECA to the undisputed facts. As this is strictly a question of law, our review is de novo.

#### A. *Plain language of the statute*

■ Section 438(a)(4) of the FECA reads:
(a) Duties of Commission
The Commission shall—

     *       *       *       *       *       *

(4) within 48 hours after the time of the receipt by the Commission of reports and statements filed with it, make them available for public inspection and copying, at the expense of the person requesting such copying, *except that any information copied from such reports or statements may not be sold or used by any person for the purpose of soliciting contributions or for commercial purposes*, other than using the name and address of any political committee to solicit contributions from such committee. A political committee may submit 10 pseudonyms on each report filed in order to protect against the illegal use of names and addresses of contributors, provided such committee attaches a list of such pseudonyms to the appropriate report. The Clerk, Secretary, or the Commission shall exclude these lists from the public record; * * *.

(emphasis added). It is undisputed that PCD did not use FEC information "for the purpose of soliciting contributions"; thus, PCD's use of FEC material can only run afoul of § 438(a)(4)—if at all—by being "sold or used * * * for commercial purposes." The FEC concedes as much. *See* FEC brief at 8.

The FEC contends that PCD's activities fall squarely within the sweep of the "commercial purposes" prohibition, since PCD sold information compiled from FEC reports for a profit. FEC admits, however, that a literal application of the statute "would obviously impede, if not entirely frustrate, the underlying purpose of the *disclosure* provisions of FECA", as it "would bar newspapers and other commercial purveyors of news from publishing the information contained in those reports under any circumstances." *NRCC*, 795 F.2d

at 192 (emphasis in original). PCD agrees with the FEC that reference to the plain language of the statute is insufficient; thus, we must move outside the four corners of the statute to "established canons of construction" in order to construe it. *Chisom v. Roemer,* — U.S. —, 111 S.Ct. 2354, 2369, 115 L.Ed.2d 348 (1991) (Scalia, J., dissenting). *See United States v. American Trucking Ass'ns,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940) ("plain language" rule); *Caminetti v. United States,* 242 U.S. 470, 485–86, 37 S.Ct. 192, 194–95, 61 L.Ed. 442 (1917) (same).

### B. *The FEC's regulation*

Pursuant to its statutory authority, *see* 2 U.S.C. § 437d(a)(8), the FEC promulgated regulations in order to flesh out § 438(a)(4)'s skeletal "commercial purposes" prohibition. This gap was left " ' * * * *' for the [FEC] to fill' in determining what commercial activities fall within the proviso's prohibition". *NRCC,* 795 F.2d at 193 (quoting *Chevron, U.S.A. Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). *See also Dial Information Services Corp. of New York v. Thornburgh,* 938 F.2d 1535, 1540–41 (2d Cir.1991). FEC attempted to fill the gap with this regulation:

> The use of information, which is copied or otherwise obtained from reports filed [with the FEC], in newspapers, magazines, books or other similar communications is permissible as long as the principal purpose of such communications is not to communicate any contributor information listed on such reports for the purpose of soliciting contributions or for other commercial purposes.

11 C.F.R. § 104.15(c) (1991). Thus, under the FEC's regulation, we shift our attention, at least initially, to the two prongs of the regulation: (1) whether PCD's use of FEC data is a "similar communication" to a newspaper, magazine, or book; and (2) if so, whether the "principal purpose" of PCD's communication is other than for "other commercial purposes."

### 1. *"Similar communication"*

■ PCD's use of FEC data may survive scrutiny under the first prong of the regulation only if the use is "similar" to a newspaper, magazine, or book. The FEC asserts that it promulgated this regulation in order to effectuate congressional intent. *See* FEC brief at 45 n. 27. Since the FECA's broad disclosure provisions indicate an unmistakable preference for first amendment values of publicity and exposure, *see* S.Rep. No. 229, 92d Cong., 2d Sess. 4, *reprinted in* 1972 U.S.Code Cong. & Admin.News 1821, 1823 ("Disclosure, if it is to be effective, must mean total disclosure"), we conclude that by the term "similar" communication congress intended to include one that furthers the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open". *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). The only shred of legislative history relating to the "newspaper" exception to § 438(a)(4) supports the conclusion that congress intended to further this national commitment: "[N]ewspapers may, if they wish, run lists of contributors and amounts [without violating § 438(a)(4)]." 117 Cong.Rec. 30,058 (daily ed. Aug. 5, 1971) (remarks of Sen. Nelson).

In advisory opinion 1986–25, FEC construed the "similar communications" requirement of 11 C.F.R. § 104.15(c) in a more limiting manner:

> Commission regulations provide that the "use" of information, copied or obtained from these reports, in "newspapers, magazines, books or other similar communications" is permissible as long as the "principal purpose" of such communications is not to communicate any contributor information listed on such reports for the purpose of soliciting contributions or for other commercial purposes. * * * The "commercial purpose" prohibition does not preclude the use of contributor information by newspapers, magazines, books, or other similar communications such as in news stories, commentaries, or editorials, although such use may be inci-

dent to the sale of such communications. [citations omitted] [PCD's] intended use of contributor information is not merely incident to their sales but is the primary focus of [PCD's] activity.

FEC advisory opinion 1986–25, at 4. Here, the FEC only hinted as to what it believes is "similar" to a newspaper, magazine, or book, and it does so by creating a further distinction: between use which is "incident to" the sale and use which is the "primary focus" of the sale.

It is true, as the FEC reminds us, that "a court may not substitute its construction of a statutory provision for a reasonable interpretation by the agency charged with administering the statute", *NRCC*, 795 F.2d at 193; but neither should it bow and curtsy to every interpretation an agency can invent. The FEC's interpretation, however, does not serve the congressional purposes of furthering the openness and disclosure purposes of the FECA, while avoiding—to the extent possible—the invasions of contributor privacy that would be occasioned by all kinds of solicitations. We thus cannot say that FEC advisory opinion 1986–25 offered a "reasonable interpretation" of either its own regulation or § 438(a)(4).

The "incident to"/"primary focus" distinction proffered by the FEC in its advisory opinion is contrary to both the words of the statute and the act's broader purposes. Indeed, the FEC's reading of the statute could bar even newspapers, magazines or books whenever FEC information was the "primary focus" of their publication. At bottom, the FEC's advisory opinion boils down to a "we know it when we see it" interpretation of § 438(a)(4), *cf. Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring), and we do not believe that congress intended to grant the FEC such uncabined discretion. Rather, the question of what is or is not "similar" to the enumerated examples should be answered by closer attention to congress's intent to expose this information to beneficial sunlight, while protecting contributors, as best as possible, from the harassment of solicitors.

We conclude that PCD used the information obtained from the FEC in a communication "similar" to a newspaper, magazine, or book. PCD's lists, although not "traditional" media, are much closer to "commercial purveyors of news", *NRCC*, 795 F.2d at 192, than they are to a list of sales prospects. They are designed in a manner that will further first-amendment values and not infringe contributor privacy by abetting solicitors. In fact, we have previously noted that *amicus* Legi–Tech, Inc. (a for-profit corporation which assembles and markets publicly-available information— quite similar to PCD) is "an organ of the press". *Legi–Tech, Inc. v. Keiper*, 766 F.2d 728, 730 (2d Cir.1985).

### 2. "Principal purpose"

■ The second prong of 11 C.F.R. § 104.15(c) requires that "the principal purpose of the communication is not to communicate any contributor information listed on such reports * * * for other commercial purposes." The FEC, in its advisory opinion, handled this "commercial purposes" language in the following manner:

The Commission has considered [PCD's] statements that its purpose is to further research and reporting of the patterns of political contributions and its promise that a warning relating to the Act's sale or use restriction will be printed on each page of the lists or packages, but does not view them as determinative of the principal purpose requirement. The Commission concludes that lists that compile individual contributor information by congressional district and by employer will have commercial value to list owners, managers, brokers, and others, even though street addresses are omitted. The format and content of [PCD's] lists are essentially indistinguishable from those of a list broker used for soliciting contributions or for commercial purposes.

FEC advisory opinion 1986–25, at 4–5. In this advisory opinion, the FEC accepted that PCD's purpose "is to further research and reporting on patterns of political contributions", yet the FEC still concluded

that "purpose" was not relevant to the interpretation of § 438(a)(4) or the FEC regulation.

Again, we disagree with the FEC. "Purpose" permeates the very text of § 438(a)(4). There is little, if any, risk that PCD's lists will result in solicitation or harassment of contributors. The absence from PCD's reports of mailing addresses and phone numbers, as well as the caveat on each page against solicitation and commercial use, make it virtually certain that these reports will be used for informative purposes (similar to newspapers, magazines, and books, which are "commercial purveyors of news", *NRCC*, 795 F.2d at 192), not for commercial purposes (similar to soliciting contributions or selling cars). The undisputed facts confirm this analysis: of over 100 PCD customers, only two said that they had purchased the reports for solicitation purposes; neither one actually solicited using PCD's lists; and one of them specifically noted the disclaimer and the lack of addresses as factors which led him to abandon that idea. *See* 753 F.Supp. at 1130.

Under the FEC's interpretation of the "principal purpose" requirement, no newspaper could print, for example, a list of contributions made by the top executives of a military contractor who had just received a large government contract (information that would surely be protected by the statute, if not by the first amendment). Nor could that newspaper print a list of the larger donors in the congressional districts that its circulation serves. In short, such a reading would plainly be contrary to the broader purposes of the FECA, and would very likely run afoul of the first amendment.

▆▆▆ Without the guidance of a reasonable agency interpretation, we must again seek further guidance outside the FECA itself. When we look to the legislative history of the § 438(a)(4) prohibition, we find that Senator Bellmon, in proposing the amendment, was concerned with the possibility that contributors would have their personal lives interrupted by unwanted solicitations. The purpose of this restriction, he said, was "to protect the privacy of" campaign contributors by insulating them, as best as possible, from "all kinds of solicitations".

These remarks seem to offer the best guidance for interpreting § 438(a)(4)'s prohibitions; they clearly indicate that the overarching goal of the prohibitions was to protect campaign contributors from "all kinds" of unwanted solicitations. Without the "commercial purposes" prohibition, the only solicitations at which the statute would be aimed would be solicitations for contributions. Since those prohibitions extend to "the purpose of soliciting contributions" and "commercial purposes", we read the latter prohibition to encompass only those commercial purposes that could make contributors "prime prospects for *all kinds of solicitations*", 117 Cong.Rec. 30,057 (remarks of Sen. Bellmon) (emphasis added), *i.e.*, not merely solicitations for "contributions", but solicitations for cars, credit cards, magazine subscriptions, cheap vacations, and the like. In light of the prohibition's purported aim of protecting the privacy of campaign contributors and the FECA's broader aim of full disclosure, not to mention the serious constitutional problems that FEC's reading would engender, *see, e.g., Communications Workers of America v. Beck*, 487 U.S. 735, 761, 108 S.Ct. 2641, 2656–57, 101 L.Ed.2d 634 (1988), this is the proper, reasonable reading of the "commercial purposes" provision.

Moreover, the privacy interests of contributors—the focus of the Bellmon amendment—are in no way damaged by this reading of the statute. The "use" of the information "for the purpose of soliciting contributions or for commercial purposes" is still prohibited by the terms of the statute. The "salting" provision of § 438(a)(4) helps to ensure that anyone who uses the information for any sort of solicitation—whether for contributions or for other forms of commerce—will be caught. The § 438(a)(4) prohibition is only violated by a use of FEC data which could subject the "public-spirited" citizens who contribute to political campaigns to "all kinds of solicitations". PCD's publications plainly are not designed

in that manner. Since none of PCD's publications is of the type that could infringe on the contributors' privacy interests, the publications at issue may be sold without violating § 438(a)(4) of the FECA.

## CONCLUSION

Because we interpret § 438(a)(4) to allow the sale of PCD's publications, we do not reach the first amendment and equal protection issues raised by PCD. The judgment of the district court is reversed, and the case is remanded with instructions to enter summary judgment for PCD dismissing the FEC's complaint.