FEDERAL ELECTION COMMISSION,
Plaintiff,

v.

LEGI–TECH, INC., Defendant.

Civil Action No. 91–0213 (JHG).

United States District Court,
District of Columbia.

May 30, 1997.

Robert William Bonham, III, Lawrence Mark Noble, Richard Blair Bader, Stephen E. Hershkowitz, Federal Election Com'n, Washington, DC, V. Colleen Miller, U.S. Dept. of Justice, Civil Rights Div., Washington, DC, for Federal Election Com'n.

Thomas J. Casey, Skadden, Arps, Slate, Meagher & Flom, L.L.P., Washington, DC, Phillip Howard Rudolph, Julia Ann Dahlberg, Gibson, Dunn & Crutcher, L.L.P., Washington, DC, Rex S. Heinke, Kelli L. Sager, Alicia J. Bentley, Gibson, Dunn & Crutcher, Los Angeles, CA, for Legi-Tech, Inc.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Presently pending are the parties' cross-motions for summary judgment. For the

reasons stated below, Plaintiff Federal Election Commission's ("FEC" or "Commission") motion will be granted, and Defendant Legi–Tech's motion will be denied.[1]

## I. Background

The following facts are either not in dispute or are not reasonably disputed. Defendant Legi–Tech is a for-profit California corporation, wholly owned by McClatchy Newspapers, Inc., a diversified media company. Operating under the trade name of "Washington On–Line," Legi–Tech opened an office in Washington, D.C., in 1985 and began marketing databases of legislative and other information regarding the United States Congress. From October 1, 1985 until December 31, 1988, Legi–Tech sold access to four databases: the Bill Text Tracking System, the Congressional Bill Track System, the Congressional Vote Tracking System, and the Campaign Contribution Tracking System ("CCTS"). The CCTS is the database at issue in this suit.

Under the Federal Election Campaign Act of 1971 ("FECA" or the "Act"), political committees are required to report the "identification" of each person who makes contributions to the reporting committee within a calendar year in an aggregate amount in excess of $200, together with the date and amount of each such contribution. *See* 2 U.S.C. § 434(b)(3). In the case of an individual contributor, the term "identification" is defined to mean the individual's name, mailing address, occupation, and the name of the individual's employer. *Id.* § 431(13)(A). *See generally Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

Another provision of the statute requires the FEC to make all such reports and statements filed with the Commission "available for public inspection, and copying, at the expense of the person requesting such copying" within 48 hours of the FEC's receipt of those documents. While § 438(a)(4) provides the public with access to this information, it also limits how that information may be used:

> information copied from such reports or statements *may not be sold or used by any person for the purpose of soliciting contributions or for any commercial purposes,* other than using the name and address of any political committee to solicit contributions from such committee.

2 U.S.C. § 438(a)(4) (emphasis added).

Through its CCTS, Legi–Tech provided subscribers with information regarding contributors and their contributions, including the contributors' telephone numbers and street addresses, beginning with the 1983–1984 election cycle. Except for the contributors' telephone numbers, which were obtained from an outside vendor, the information was copied directly from the disclosure reports on file with the Commission, entered into the CCTS database and sold to Legi–Tech's CCTS customers through subscriptions providing access to the database.[2]

When Legi–Tech developed the CCTS, it was aware that the sale of individual contributor information obtained from the FEC's files was "probing the edges of the law." FEC Ex. 43 at 1. Legi–Tech planned to "challenge the various federal laws against commercial use of this information" as a central part of its marketing strategy, hoping that "[t]he ensuing controversy regarding the campaign contribution laws and our open disregard for them will provide for an extremely quick market identification." *Id.* at 2. Simply put, Legi–Tech invited this suit as a central component of its marketing strategy:

> [I]t is important to recognize the extent of the controversy Legi–Tech will be involved [in] with campaign contributions. We would expect to be sued by the government almost immediately after we begin selling the service. The suit will draw immediate attention to the firm and what we are doing. None of this attention will

1. Neither party requested an oral hearing on these motions. *Cf.* Defendant's Legi–Tech's Notice of Motion and Motion for Summary Judgment at 1 n.*. Whether to hold a hearing is a decision committed to the Court's discretion. *See* Local Rule 108(f). In this case, a hearing is unnecessary to resolve the cross-motions for summary judgment.

2. In 1986 or 1987, Legi–Tech ceased including the street addresses and telephone numbers of contributors.

be negative. I think we can expect the press to immediately understand the issues as First Amendment based and will be rather supportive of us. Therefore, it is in Legi–Tech's commercial interest to encourage the government to take swift action against us.

*Id.* at 10.

Legi–Tech marketed the CCTS to potential customers by direct mail and by advertisements in newspapers, magazines and through radio "spots." With the assistance of an advertising and market research firm, Legi–Tech defined a target market for the CCTS consisting of four major groups: the media, corporate groups, special interest groups and the political establishments. The promotional literature mailed to its prospective CCTS customers contained a statement that "[i]t is a violation of federal law to sell or use information copied from [FEC] reports for the 'purpose of soliciting contributions from other than political committee.'" FEC Ex. 3.

Legi–Tech entered into written agreements with its customers in which they agreed to pay either fixed amounts for unlimited access to the CCTS during predetermined periods of time or a combination of hourly rates. At least 51 persons purchased access to the CCTS. Of 42 customers who purchased access to the CCTS alone, Legi–Tech received at least $273,869.87. *See* FEC Ex. 42.

3. FEC Ex. 12. The memorandum produced during discovery by Legi–Tech and which memorializes a meeting between Legi–Tech staff and Teamsters personnel includes the following:
Eric [of WOL] stopped in to see Greg [and Colleen of the Teamsters].
. . .
\* \* \* \* \* \*
Teamsters generally follows company PACs and individuals within the companies. They monitor chapters monthly and they try to establish patterns on contributions from the[ir] companies and chapters. *If they see the possibility of getting more contributions from a company, then they will start a grass-roots campaign.*
\* \* \* \* \* \*
Colleen's suggestions:
\* \* \* \* \* \*
3) itemize Line 21 Refunds. Without this itemized it reduces the accuracy of the info, such as if someone returns a check, it will still show up on the expenditures. This can be of

The agreements with CCTS customers contained the following statement:

information contained in the Campaign Contribution Tracking System has been copied by [Legi–Tech] from reports filed with the Federal Election Commission. It is a violation of federal law to sell or use information copied from such reports for the purpose of soliciting contributions from other than political committees.

FEC Exs. 7–8.

Additionally, when CCTS customers would log onto the CCTS system, a standard information screen appeared on their computer monitors which included the following sentence: "Any information copied from FEC reports or statements may not be sold or used by any person for the purpose of soliciting contributions or for commercial purposes."

Despite these statements, at the time it entered into or renewed customer agreements providing access to the CCTS database, Legi–Tech had actual or constructive knowledge that at least some of its customers planned to use or had already used the CCTS information to solicit funds from contributors. For example, Legi–Tech was advised, and its staff memorialized in internal memoranda, that the International Brotherhood of Teamsters used the CCTS as part of its contribution solicitation program.[3] The

great significance because it could put them over the maximum amount of contributions.
\* \* \* \* \* \*
Colleen asked that Eric check some info for her. Both Colleen and Greg were very nice and could not stress enough how much they rely on WOL for all their information. *They said that lawsuits could result against them if suggestion # 3 ins't (sic) implemented.*
FEC Ex. 12 (emphasis added).
While admitting that this memorandum represents the notes of former Legi–Tech employees, *see* Legi–Tech's Evidentiary Objections at 5 [attached to Docket No. 34], Legi–Tech contends that FEC Exhibit 12 is inadmissible hearsay. However, Legi–Tech has overlooked the fact that even if such memoranda are not admissible to prove that the Teamsters did what is said (i.e., for the truth of the matter asserted), they would be admissible to show what Legi–Tech and its agents believed (i.e., as evidence of state of mind): that the Teamsters were using the CCTS

Teamsters used the CCTS to monitor contributions by its membership and, when it perceived "the possibility of getting more contributions" from certain of its members, it would solicit contributions from those members.

Legi–Tech was also aware that other CCTS customers used the CCTS for soliciting contributions. At the time that it sold CCTS access to the Freedom Policy Foundation (under the name "National Endowment for the Preservation of Liberty"), it knew that this organization had used CCTS information in the past for soliciting contributions.[4] And, despite knowing that the Democratic Congressional Campaign Committee ("DCCC") planned to use CCTS information to monitor contributions and solicit the same from contributors who had not exhausted their contribution limits, Legi–Tech twice renewed its contract with the DCCC.[5] Legi–

Tech renewed its agreement with the National Association of Independent Schools under similar circumstances.[6]

One of Legi–Tech's CCTS customers, the International Funding Institute, Inc. ("IFI"), used the CCTS information to create and market a solicitation list. IFI, a political and managerial consulting firm that engaged in fundraising, advertising, public relations, marketing and other commercial activities, subscribed to the CCTS in May of 1986. One mailing list, entitled "Active Republican Donors," was compiled exclusively from information provided to IFI through its subscription to the CCTS database.[7] During September of 1986, IFI marketed the "Active Republican Donors" list to at least five different organizations, at least four of which used the information to solicit contributions. One such organization was the American Citizens for Political Action, Inc. ("ACPA").[8]

---

to monitor and then solicit contributions. *See* Fed.R.Evid. 803(3). Alternative bases for admission would appear to include Fed.R.Evid. 803(6) (business record); 801(d)(1) (admission by a party through its agents); 801(d)(2) (admission against interests); 803(1) (present sense impression); 803(5) (recorded recollection) and 802(24) (statements having special guarantees of trustworthiness).

4. FEC Ex. 20. Exhibit 20, a Legi–Tech employee's notes dated Nov. 9, 1987, reflect: "Gaylae told me that this Org. use[d] to be under the name National Endowment and that they still owe money. Also they were using their info to solicte (sic) people." Legi–Tech's objections to the admissibility of this exhibit are meritless. *See supra* n. 3.

5. FEC Exs. 13–14. A report of a training session conducted on April 16, 1987, by Legi–Tech personnel, states, in relevant part:
   A major use for the DCCC will be to look up contributors for a particular election cycle and see if they have exhausted (sic) their limit amount to any candidate so that *if not, they can be approached for a further contribution pledge* to one of their affiliated members.
   Ex. 14 (emphasis added).
   Legi–Tech's objections to the admissibility of this exhibit are meritless. *See supra* n. 3.

6. FEC Exs. 15–16. This exhibit is a report of a CCTS training session conducted on June 19, 1987, by Legi–Tech employees. In relevant part, the memorandum provides:
   NAIS would benefit most using Contributor Tracking. *They are primarily interested in obtaining names through our data base which could at later dates be used as sources for them*

*to get contributions for their independent schools organization.* For example, they will look at a federal candidate who attended an independent school and look to them for a contribution, in turn they will look at those individuals who contributed to that candidate also use them as prime sources.
Ex. 16 (emphasis added).
   Legi–Tech's objections to the admissibility of Exhibit 16 are meritless. *See supra* n. 3.

7. The names and addresses of the contributors on the CCTS database from which IFI developed its mailing list included the names and addresses of contributors to the National Republican Congressional Committee ("NRCC"). Among the contributors reported by the NRCC, and thus copied by Legi–Tech and included in the CCTS database, were pseudonyms used to "salt" or "seed" the lists to detect unlawful use. Under 2 U.S.C. § 438(a)(4), political committees are authorized to include up to ten pseudonyms for this purpose. *See FEC v. Political Contributions Data, Inc.*, 943 F.2d 190, 193 (2nd Cir.1991).

8. In 1990, after satisfying the procedural requirements of the Act, the FEC filed suit against both IFI and ACPA in the United States District Court for the District of Columbia. After an unsuccessful interlocutory challenge to the constitutionality of 2 U.S.C. § 438(a)(4) and the FEC's implementing regulations in 11 C.F.R. § 104.15, *see FEC v. International Funding Institute, et al.*, 969 F.2d 1110 (D.C.Cir.) (en banc) *cert. denied*, 506 U.S. 1001, 113 S.Ct. 605, 121 L.Ed.2d 540 (1992), IFI and ACPA were held to have knowingly and willfully violated the Act. *FEC v. International Funding Institute, et al.*, 1993 WL 79507 *3 (RCL) (D.D.C. Mar.11, 1993).

On October 24, 1985, the NRCC filed an administrative complaint against Legi–Tech pursuant to 2 U.S.C. § 437g(a)(1), alleging that Legi–Tech had violated the Act.[9] The NRCC is a political committee whose "primary activity is fundraising" and whose "principal business asset is its list of donors, created through an expensive and laborious process of targeting and soliciting likely contributors." *National Republican Congressional Committee v. Legi–Tech Corp.*, 795 F.2d 190, 191 (D.C.Cir.1986).

Following the procedural requirements of the Act, the FEC found reason to believe that Legi–Tech had violated 2 U.S.C. § 438(a)(4) and 11 C.F.R. § 104.15, and it commenced an investigation. The Commission later found probable cause to believe that Legi–Tech had violated the Act, and it engaged in efforts to correct the violations through conciliation negotiations with Legi–Tech. When those efforts failed, the FEC filed the instant civil enforcement suit in this Court pursuant to 2 U.S.C. § 437g(a)(6).[10]

In its Complaint, the FEC seeks declaratory and injunctive relief as well as a civil penalty of five thousand dollars for each violation of 2 U.S.C. § 438(a)(4) by Defendant Legi–Tech. *See* Compl. at 5 (citing 2 U.S.C. § 437g(a)(6)(B)). The FEC alleges that through the CCTS, Legi–Tech "sold or used information copied from reports filed with the Commission for commercial purposes, in violation of the Act, 2 U.S.C. § 438(a)(4)." *Id.* ¶ 18. Discovery is closed, and the parties' cross-motions for summary judgment are ripe.

## II. Discussion

The principal questions raised by the parties' cross-motions and the facts presented here are simply whether Legi–Tech's sale of

subscriptions to the CCTS data base were for a commercial purpose within the meaning of the Act, as implemented through the agency's implementing regulations at 11 C.F.R. § 105.15(c); and, if so, whether that interpretation squares with the First Amendment.

### A. The standard of review.

Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. at 2513–14. At the same time, however, Rule 56 places a burden on the nonmoving party to "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### B. The statutory challenge.

Under the Act, the FEC is required to make reports and statements filed with it available for public inspection "except that any information copied from such reports or

9. This administrative complaint was designated as Matter Under Review ("MUR") 2094 and later merged with MUR numbers 2307, 2346 and 2361, which were filed against ACPA, IFI and others.

10. This suit was initially stayed due to the pendency of *FEC v. International Funding Institute, Inc.*, 969 F.2d 1110 (D.C.Cir.) (en banc), *cert. denied*, 506 U.S. 1001, 113 S.Ct. 605, 121 L.Ed.2d 540 (1992). *See* Order of Mar. 19, 1991 [Docket No. 6]. After the D.C. Circuit handed down *IFI*, the stay was lifted and the parties filed cross-motions for summary judgment. However,

before ruling on the cross-motions, the Court granted Legi–Tech's motion to dismiss based on *FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C.Cir.1993), *cert. dismissed*, 513 U.S. 88, 115 S.Ct. 537, 130 L.Ed.2d 439 (1994). On appeal, the Court of Appeals distinguished *NRA Political Victory Fund*, reversing the grant of Legi–Tech's motion to dismiss and remanding for appropriate proceedings. *FEC v. Legi–Tech, Inc.*, 75 F.3d 704 (D.C.Cir.1996). The parties then renewed their cross-motions for summary judgment, which are now ripe for resolution.

statements may not be sold or used by any person for the purpose of soliciting contributions or for commercial purposes." 2 U.S.C. § 438(a)(4). The FEC has implemented this statutory provision through 11 C.F.R. § 104.15, which, in relevant part, states:

> The use of information, which is copied or otherwise obtained from reports filed under 11 C.F.R. part 104, in newspapers, magazines, books or other similar communications is permissible as long as the principal purpose of such communications is not to communicate any contributor information listed on such reports for the purpose of soliciting contributions or for other commercial purposes.

11 C.F.R. § 104.15(c).

In moving for summary judgment in its favor, Legi–Tech argues that Section 438(a)(4) of the Act is inapplicable to it as an organ of the press. Relying upon a floor colloquy, Legi–Tech states that "[w]hile debating Section 438(a)(4), the Senators expressed significant concern about protecting the [r]ights of the press and made it clear that Section 438(a)(4) does not apply here." Defendant Legi–Tech's Notice of Motion and Motion for Summary Judgment: Supporting Memorandum of Points and Authorities ("Legi–Tech's MSJ") at 11. "This [c]ongressional intent to exempt the media from this restriction was codified into the federal regulations, specifically 11 C.F.R. Section 104.15(c)." *Id.* According to Legi–Tech, this regulatory provision exempts it from the Act because the CCTS is a communication similar to a newspaper, book or magazine, *id.* at 13–18, and the principal purpose of the CCTS was not a commercial purpose in violation of the Act. *Id.* at 19–20.

The FEC views things differently. Through a series of advisory opinions and in the underlying administrative proceedings, it "has concluded that [Legi–Tech's] sale of lists of contributor information for profit ... reflects a 'commercial purpose' within the meaning of the Act." Plaintiff FEC's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment and in Opposition to Defendant Legi–Tech's Summary Judgment Motion ("FEC's MSJ") at 16. "The Commission has also construed its

regulation to permit a publisher to use names and addresses from reports filed with the Commission when it is incidental to the sale of a larger publication, such as to provide leads for news articles included in a newspaper sold commercially, but not to permit the use of individual contributor names when the 'intended use of contributor information is not merely incident to the[ ] sales but is the primary focus of [the] activity.' " *Id.* (citing Advisory Op. 1981–38, *reprinted in* 1 Fed. Elec.Camp.Fin.Guide (CCH) ¶ 5624, at 10,791 (Oct. 13, 1981), and quoting Advisory Op. 1986–25, *reprinted in* 2 Fed.Elec.Camp.Fin. Guide (CCH) ¶ 5865, at 11,298 (Aug. 15, 1986)).

According to the FEC, "when the information sold is 'composed primarily, if not exclusively, of individual contributor information and incorporate[s] nearly all of the identification of individual contributors reported to the Commission,' the Commission has concluded that the commercial sale of this contributor information by itself is the primary purpose of the sales." *Id.* (quoting Advisory Op. 1986–25, *supra* ¶ 5865, at 11,299, and citing Advisory Op. 1991–16, *reprinted in* 2 Fed. Elec.Camp.Fin.Guide (CCH) ¶ 6022, at 11,720 (June 18, 1991)). "The logical and foreseeable consequence of the promotion and sale of such lists of contributor information is that the customers involved in politics would purchase the product to obtain names of likely contributors. Such use of names from reports filed with the Commission is directly contrary to the intent of section 438(a)(4).' " *Id.* (quoting Advisory Op. 1991–16, *supra* ¶ 6022, at 11,720). Based on these interpretations, the FEC argues that Legi–Tech's activity of selling subscriptions to the CCTS is more akin to that "of a listbroker" than that "of a newspaper." *Id.* at 18.

■ Because "FECA is ambiguous with respect to whether commercial activity like Legi–Tech's [Campaign Contribution] Tracking System is protected," *Legi–Tech,* 795 F.2d at 192, the FEC's construction of 2 U.S.C. § 438(a)(4), if reasonable, is entitled to deference. *Id.* at 193 (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), and

*FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37, 102 S.Ct. 38, 44–45, 70 L.Ed.2d 23 (1981)).[11] Through 11 C.F.R. § 104.15(c), and its advisory opinions, the agency has reasonably filled the gap left by Congress while accommodating the competing policy objectives identified by Congress. *Id.; see K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C.Cir.1992) (agency is entitled to "even more deference in its interpretation of its own regulations than in the reading of its statutory mandate").

■ The state and the FEC's implementing regulation provide for the full disclosure of political contributions, and that regulation generally permits the use and publication of the information. The exception is where the principal purpose of the use of this information is the solicitation of contributions or the commercial sale of the information itself. Accommodating the competing interests of promoting disclosure of campaign contribution information with the protection of private citizens' privacy and the property interests of the political committees, *see IFI*, 969 F.2d at 1116; *Legi–Tech*, 795 F.2d at 191, the FEC has reasonably drawn the line between "newspapers, magazines, books or other similar communications" that reproduce contributor information for the principal purpose of soliciting contributions or selling that information and communications in which the publication of contributor information is incidental and not the primary focus. *See* Advisory Op. 1981–38, *supra* ¶ 5624; Advisory Op. 1986–25, *supra* ¶ 5865; Advisory Op. 1991–16, *supra* ¶ 6022. The FEC's interpretation of the statute and its regulation is reasonable, that regulation is fully consistent with plain text of the statute, *see* 2 U.S.C. § 438(a)(4), and it is completely in accord with other evidence of the underlying congressional intent. *See, e.g.*, 117 Cong.Rec. 30,058 (Aug. 5, 1971), *reprinted in* Legislative History of the Federal Election Campaign Act of 1971, at 582 (GPO 1981) ("only purpose [of the amendment] is to prohibit the lists from being used for commercial purposes") (remarks of Sen. Nelson); *id.* ("the

list brokers, under this amendment, would be prohibited from selling the list or using it for commercial solicitation") (remarks of Sen. Bellmon).

■ In light of the material facts of this case, the FEC's determination that Legi–Tech's CCTS falls on the wrong side of the line drawn by the agency's regulation is not an unreasonable one. First, CCTS cannot fairly be characterized as a communication that is similar to a "newspaper, magazine or book"—communications which are exempt from the prohibition of 2 U.S.C. § 438(a)(4) through the FEC's regulation at 11 C.F.R. § 104.15(c) (the media exemption). While a multi-media corporation can (and many do) provide computerized information that is similar to a newspaper, magazine or book, merely reproducing the campaign contribution information provided to the FEC is, as the FEC recognizes, more akin to that of a list-broker. Legi–Tech's CCTS is nothing more than a computerized list of campaign contribution information copied from FEC files. The CCTS cannot fairly be characterized as an electronic newspaper, magazine, book or similar communication. The Court agrees that "the mere fact that the CCTS provided users with [a] list of contributors on a computer screen rather than on paper is of no significance." FEC's Superseding Reply at 11.

Second, Legi–Tech's CCTS fails the "principal purpose" test. Through the CCTS, Legi–Tech provided its subscribers with information that was copied directly from reports filed with the FEC, except to the extent it supplemented that information with the individual contributors' telephone numbers (making the solicitation of contributions even easier, as demonstrated by the actions of IFI and its customers). Unlike the incidental reporting of contributor information in "news stories, commentaries, or editorials," Advisory Op. 1986–25, *supra* ¶ 5865, at 11,-298, Legi–Tech's sale of contributor information through the CCTS was not only the primary focus of its activity, but, as the FEC points out, it was the CCTS's only purpose.

---

11. Even were the Court to accept Legi–Tech's argument that the FEC is not entitled to deferential *Chevron* review, the Court would neverthe-less uphold the FEC's interpretation of 2 U.S.C. § 438(a)(4).

Legi–Tech's sale of information through the CCTS posed the precise threat that troubled Congress: while Congress wanted to promote disclosure of campaign contribution information, it also wanted to protect political committees' intellectual property and "political discourse from the adverse effect that the disclosure requirement of the Act would otherwise have." *IFI*, 969 F.2d at 1117.

The authority upon which Legi–Tech relies to the contrary is neither binding nor persuasive. The primary case cited by Legi–Tech in support, *FEC v. Political Contributions Data, Inc.*, 943 F.2d 190 (2nd Cir.1991), narrowly construed Section 438(a)(4) to proscribe only the use of the FEC information for soliciting contributions. That case involved a defendant who, like Legi–Tech here, provided access to a computerized data base of FEC campaign contribution information. However, on substantially different facts than those presented here, the court stated: "Since none of PCD's publications is of the type that could infringe on the contributor's privacy interests, the publications at issue may be sold without violating § 438(a)(4) of the FECA." 943 F.2d at 198.

Even had *Political Contributions Data* involved facts similar to those presented here,[12] the reasoning employed by that court is not persuasive. For example, the opinion appears to have adopted an overbroad interpretation of the scope of the regulation implementing 2 U.S.C. § 438(a)(4):

> Under the FEC's interpretation of the 'principal purpose' requirement, no newspaper could print, for example, a list of contributions made by the top executives of a military contractor who had just received a large government contract (information that would surely be protected by the statute, if not by the first amendment). Nor could that newspaper print a list of larger donors in the congressional districts that its circulations serves. In short, such a reading would plainly be contrary to the broader purposes of the FECA, and would

very likely run afoul of the first amendment.

943 F.2d at 197.

As this Court reads the FEC's regulation and its advisory opinions, the agency's interpretation of the statute does nothing of the sort. In fact, the agency expressly provides for the sort of publication described in *Political Contributions Data*, since such publication would be incidental to the primary purpose of a newspaper. *See Legi–Tech*, 795 F.2d at 193. What the agency proscribes is list-making: the copying and selling of campaign contributor and contribution information where the principal purpose is the sale of that information, a transaction akin to list-making and brokering. *Id.*

■ In attempting to avoid the constitutional issue, the *Political Contributions Data* court read the phrase "or for commercial purposes" out of the statute. While courts are to construe statutes to avoid constitutional conflicts where possible, such a mandate cannot include ignoring plain text that might pose a conflict. *See Edmond v. United States*, —— U.S. ——, 117 S.Ct. 1573, —— L.Ed.2d —— (1997) (Scalia, J., Op. for the Court) ("a constitutional question confronted in order to preserve, if possible, a congressional enactment is not a constitutional question confronted unnecessarily").

Moreover, not only does the *Political Contributions Data* opinion appear to conflict with the law of this Circuit regarding the appropriate deference to which the FEC is entitled, *see Legi–Tech*, 795 F.2d at 193–94, but that opinion does not appear to address "the value of a political committee's intellectual property" as one of the governmental interests underlying 2 U.S.C. § 438(a)(4). *Compare Political Contributions Data*, 943 F.2d at 198 *with IFI*, 969 F.2d at 1116–17. For all of these reasons, *Political Contributions Data* does not rescue Legi–Tech from the result reached here.

---

12. For example, the defendant's reports did not include the contributors' telephone numbers and addresses, as has Legi–Tech's CCTS. *See* 943 F.2d at 197. Additionally, there is no suggestion in *Political Contributions Data* that the defendant knew its customers were using the computer service to solicit contributions or that the defendant invited the FEC's lawsuit as a component of its marketing strategy.

**532**

■ Also unpersuasive is Legi–Tech's argument that the CCTS is exempt from the Act because Legi–Tech's parent corporation is a diversified media company. What matters is not who owns Legi–Tech or the nature of that owner's businesses, but the principal purpose and type of communication in which the campaign contribution information is used. Even a corporation that is "an organ of the press," *Legi–Tech, Inc. v. Keiper*, 766 F.2d 728, 730 (2nd Cir.1985), or otherwise in the newspaper or multi-media business, is not entitled to compile FEC campaign contribution lists for the primary purpose of a commercial sale of that information. *See Legi–Tech*, 795 F.2d at 193.

## C. The constitutional challenge.

Legi–Tech next challenges the FEC's construction of 2 U.S.C. § 438(a)(4), contending that it runs afoul of the First Amendment because it prevents "the dissemination of the truth about political campaigns" and constitutes "a content based restriction on core political speech." Legi–Tech's MSJ at 21.[13] The FEC, pointing out that the D.C. Circuit has already upheld the constitutionality of 2 U.S.C. § 438(a)(4) on its face and as applied to one of Legi–Tech's CCTS customers, *see* FEC's MSJ at 28 (citing *IFI*, 969 F.2d at 1110), argues that the statute strikes an appropriate constitutional balance, leaving "undisturbed a pre-existing barrier to defendant['s] use of" campaign contribution list information. *Id.* at 29 (quoting *IFI*, 969 F.2d at 1113). Like its statutory challenge, Legi–Tech's constitutional attack falls short.

■ In *IFI*, the Court of Appeals applied intermediate scrutiny to the First Amendment challenge of 2 U.S.C. § 438(a)(4). *See* 969 F.2d at 1116. Under this standard, the statute survives constitutional challenge if "the restriction further[s] 'an important or substantial government interest unrelated to the suppression of expression' and [is] 'no greater than is necessary or essential to the protection of the particular governmental interest involved.'" 969 F.2d at 1114 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32, 104 S.Ct. 2199, 2207, 81 L.Ed.2d 17 (1984)). This standard applies because "[b]oth in *Seattle Times* and here, the Government compelled disclosure of information for a particular purpose and prohibited use of that information for other purposes; like the newspaper in *Seattle Times*, the defendants here have no claim of right to the benefit of the compelled disclosure apart from the measure in which the concomitant use restrict is found." *Id.* That reasoning applies equally to this case.

■ Applying the intermediate scrutiny standard blunts the defendant's constitutional argument.[14] As the Court of Appeals found in *IFI*, § 438(a)(4) serves important governmental interests by minimizing the adverse effects of the Act's disclosure requirements. In addition to protecting political committees' intellectual property, *see* 969 F.2d at 1116, the Act preserves the level of political discourse:

> Without the use restriction of § 438(a)(4), innumerable entrepreneurs would, like the

---

**13.** Legi–Tech cannot persuasively contend that the statute has constrained the expression of any views or opinions on any public issues. The statute requires disclosure and promotes publication; it only restricts the defendant's attempt to "appropriat[e] to itself the harvest of those who have sown." *San Francisco Arts & Athletics v. United States Olympic Comm.*, 483 U.S. 522, 541, 107 S.Ct. 2971, 2983, 97 L.Ed.2d 427 (1987) (quoting *International News Serv. v. Associated Press*, 248 U.S. 215, 239–40, 39 S.Ct. 68, 72–73, 63 L.Ed. 211 (1918)) (internal quotation omitted, alteration in original).

Legi–Tech's true concern is with the statute's restriction of its attempt to acquire the property of others, not with any restrictions on its political speech. *See IFI*, 969 F.2d at 1119 (Buckley, J., concurring) ("The International Funding Insti-

tute ('IFI') seeks the uncompensated use of lists of names and addresses compiled at considerable cost by private parties. The Federal Election Campaign Act, however, recognizes that those lists have economic value, and it protects the reporting committee's exclusive proprietary interest in them by forbidding their use by third parties 'for the purpose of soliciting contributions or for commercial purposes.' 2 U.S.C. § 438(a)(4)."). In this regard, Legi–Tech's situation is not materially different from IFI's or IFI's co-defendants.

**14.** So would the application of the four-part test of *Central Hudson v. Public Service Comm. of New York*, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980), under these facts. *See Lanphere & Urbaniak v. Colorado*, 21 F.3d 1508 (10th Cir.1994).

defendants here, be able freely to appropriate to themselves part of the value of the contributor lists compiled by reporting political committees. As a result, such committees would have less incentive to compile the lists in the first place. In other words, if the return on their investment in solicitation would be reduced by others using the resulting lists, political committees would not find it worthwhile to solicit as much as they now do; they would raise less money, spend less money, and correspondingly underwrite less political discourse.

*Id.* at 1117 (citing *Buckley v. Valeo,* 424 U.S. 1, 19, 96 S.Ct. 612, 635, 46 L.Ed.2d 659 (1976)).

While Legi–Tech attempts to distinguish itself from its customers (i.e., the defendants in *IFI,*) the governmental interests relied upon by the Court of Appeals in *IFI* are fully applicable here. Through the CCTS, Legi–Tech provided the campaign contributor information to its customers in whole and in a form that facilitated use of that information for solicitation purposes. The applicable governmental interests are apparent from the text Congress enacted—text which prohibits the use of this information both for soliciting contributions and for commercial purposes. The reason? Such uses diminish the economic value of the contributor lists belonging to the political committees reporting to the FEC. Prohibiting the commercial trade of this information preserves the value of the political committees' intellectual property as well as their "incentive to compile the

lists in the first place." *IFI,* 969 F.2d at 1117.

Moreover, prohibiting the commercial trade of this information preserves the effectiveness of the private campaign financing system by reducing the discouraging effects of compelled disclosure on the willingness of individuals to finance political discourse. *See Buckley v. Valeo,* 424 U.S. at 66–68, 96 S.Ct. at 657–58. Section 438(a)(4) was enacted as a means to encourage citizens to participate in electoral campaigns by assuring them that the disclosure required by § 438(a)(4) of their identities, addresses, contributions, and employers would not result in the addition of their names to lists that could be used for solicitation or exploited commercially.[15] Simply put, the prohibition on list-selling and solicitation contained in the statute (and implemented through the FEC regulation) furthers substantial government interest unrelated to the suppression of expression. And, contrary to Legi–Tech's view, the statute is neither facially overbroad, *IFI,* 969 F.2d at 1118, nor as it has been applied unconstitutionally in this case.[16] The scope of the restriction, in general and as applied here, is no greater than necessary to protect the substantial government interests. *Id.* at 1115 & 1117–18. Giving effect to only the solicitation component of Congress's proscription on solicitation or commercial use would not protect all of the substantial interests that Congress identified, such as the political parties' intellectual property interest. *See id.* at 1118.

---

**15.** The statement by Sen. Bellmon makes clear that the protection of personal privacy was important, not as an end in itself, but to encourage participation in the electoral process:

> [T]he purpose of this amendment is to protect the privacy of the generally very public-spirited citizens who may make a contribution to a political campaign or a political party. We all know how much of a business the matter of selling lists and list brokering has become. These names would certainly be prime prospects for all kinds of solicitations, and will open up the citizens who are generous and public spirited enough to support our political activities to all kinds of harassment, and in that way tend to discourage them from helping out as we need to have them do.

117 Cong.Rec. 30,057 (Aug. 5, 1971), *reprinted in Leg. Hist., supra* at 581.

**16.** The defendant proposes a subjective interpretation involving "misuse" of the information, suggesting that a prohibition only on the solicitation of contributions would fully satisfy the statute's objective. However, this proposal is premised on an overly narrow view of the important governmental interests at stake. Congress was concerned not only with prohibiting solicitation due to the personal privacy interests implicated, but also with the diminution of intellectual property arising from the commercial sale of information reported by the political committees and the potential adverse impact upon the political process (and political speech) resulting when citizens are deterred from participating due to the wholesale list-making adjunct to the commercial sale of such information.

Legi–Tech's other arguments are similarly rejected. Its reliance upon cases in which the statutes at issue prohibited the press from reporting information released by the government are inapposite. Those cases simply do not command a different result than the decision here. Of course, as Legi–Tech argues, the government cannot completely suppress the dissemination of truthful information, *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), anymore than it can restrict the flow of truthful information merely because it believes that exposure to the information itself would be harmful, *Linmark Associates v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977). *See generally* Lawrence Tribe, American Constitutional Law § 12–15, at 653–54 (1978). But, contrary to Legi–Tech's position, the FEC is not doing so here. The Act, by making information public, which otherwise would not be available, actually promotes and encourages the publication of campaign finance and political contribution information. The mere fact that the information made public is later reproduced in a format constituting speech does not automatically mean that Congress has forfeited all of its power to regulate the commercial use of that information. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978). Legi–Tech, "like the newspaper in *Seattle Times*, [has] no claim of right to the benefit of the compelled disclosure *apart from the measure in which the concomitant use restriction is found*." *IFI*, 969 F.2d at 1114 (citing *Seattle Times*, 467 U.S. at 33, 104 S.Ct. at 2208) (emphasis added by this Court). The fact that Legi–Tech is not allowed to do all that it wishes in connection with that information, does not make the statute constitutionally infirm. *Id.* at 1115.

Legi–Tech also relies upon a line of cases, including *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979); *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975); and *The Florida Star v. B.J.F.*, 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989), for the proposition that the First Amendment shields it from sanctions where it merely publishes truthful information obtained from government records. However, each of those cases involved different statutes and different underlying governmental interests than is involved here. If protecting personal privacy were the only interest implicated by § 438(a)(4), then perhaps these authorities would support Legi–Tech's current attempt "to appropriat[e] to itself the harvest of those who have sown." *IFI*, 969 F.2d at 1117 (quoting *San Francisco Arts & Athletics*, 483 U.S. at 541, 107 S.Ct. at 2983 (quoting *International News Serv. v. Associated Press*, 248 U.S. 215, 239–40, 39 S.Ct. 68, 72–73, 63 L.Ed. 211 (1918)) (alteration in original)).

### D. Civil penalties.

Under the authority of 2 U.S.C. § 437g(a)(6)(B),[17] the FEC seeks a civil penalty of $5,000 against Legi–Tech for each violation of 2 U.S.C. § 438(a)(4). While Legi–Tech challenges the constitutionality of such a sanction, the Supreme Court has recognized that civil sanctions can be imposed even for the publication of truthful information that is lawfully obtained. *The Florida Star v. B.J.F.*, 491 U.S. at 537, 109 S.Ct. at 2611. Nor is the appropriateness of a civil penalty undermined due to the lack of a scienter provision where one can be implied. *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 523–25, 114 S.Ct. 1747, 1752–54, 128 L.Ed.2d 539 (1994).

Based on facts that are not, or cannot be, reasonably disputed, Defendant Legi–Tech knowingly violated the Act. *See supra* pp. 525–528. *Compare FEC v. American Int'l Demographic Serv., Inc.*, 629 F.Supp. 317, 320 (E.D.Va.1986) (awarding civil penalty under § 437g(a)(6)(C) for using names of contributors to political organizations for commercial purposes). The Court has de-

---

17. This provision provides, in relevant part, "the court may grant ... a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation, upon a proper showing that the person involved has committed ... a violation of this Act."

termined that four such violations are appropriate for civil penalties. *See supra* pp. —— – —— (describing Legi–Tech's transactions with the International Brotherhood of Teamsters, Freedom Policy Foundation, DCCC and IFI). Accordingly, in addition to injunctive relief, civil penalties totaling $20,000 will be imposed.

### III. Conclusion

Accordingly, it is hereby

**ORDERED** that Legi–Tech's Motion for Summary Judgment is denied; it is

**FURTHER ORDERED** that the FEC's Motion for Summary Judgment is granted. In accordance with Fed.R.Civ.P. 58, judgment shall be entered separately. The FEC is hereby awarded costs and shall submit its bill of costs in accordance with Local Rule 214; it is

**FURTHER ORDERED** that the Court finds that, as detailed *supra*, Legi–Tech has violated 2 U.S.C. § 438(a)(4) by selling or using information copied from reports filed with the FEC for commercial purposes in that the sale of such information was the principal purpose and primary focus of Legi–Tech's actions, and Legi–Tech is hereby permanently enjoined from further such violations; and it is

**FURTHER ORDERED** that in accordance with the factual findings and legal conclusions outlined *supra*, under the authority of 2 U.S.C. § 437g(a)(6)(B), civil penalties are imposed against Defendant Legi–Tech for four (4) violations of 2 U.S.C. § 438(a)(4) totaling $20,000.

IT IS SO ORDERED.

### *JUDGMENT*

In accordance with the Memorandum Opinion and Order issued this date, and pursuant to Fed.R.Civ.P. 58, judgment is hereby entered in favor of Plaintiff Federal Election Commission and against Defendant Legi–Tech, Inc.

IT IS SO ORDERED.